612 F.2d 848
 21 Fair Empl.Prac.Cas. 895,
22 Empl. Prac. Dec. P 30,563
 Susan PAXMAN and Leslie Gough, Appellees,
v.
Dr. W. E. CAMPBELL, Division Superintendent, Henrico County
Public Schools; Mrs. John Decesebio, Member, Henrico County
School Board; Cecil Childress, Member, Henrico County School
Board; Mrs. Betty McMullin, Member, Henrico County School
Board; Cecil F. Jones, Member, Henrico County School Board;
Oliver J. Sands, Jr., Member, Henrico County School Board;
Rev. Walter Whitt, Member, Henrico County School Board, Appellants.
Susan PAXMAN et al., Appellees,
v.
SCHOOL BOARD OF THE CITY OF STAUNTON, VIRGINIA, Appellant.
Susan PAXMAN et al., Appellees,
v.
Clarence S. McCLURE, Division Superintendent, Albemarle
County Public Schools; Comer Smith, Member, Albemarle County
School Board; Douglas White, Member, Albemarle County School
Board; Allen Kindrick, Member, Albemarle County School
Board; Carl M. Van Fossen, Member, Albemarle County School
Board; H. Edward Chapman, Member, Albemarle County School
Board; Rodger Rinehart, Jr., Member, Albemarle County School
Board, Appellants.
Susan PAXMAN et al., Appellees,
v.
Dr. W. E. CAMPBELL, Henrico Division Superintendent; Mrs.
John Deusebio, Member, Henrico County School Board; Cecil
Childress, Member, Henrico County School Board; Mrs. Betty
McMullin, Member, Henrico County School Board; Cecil F.
Jones, Member, Henrico County School Board; Oliver J. Sands,
Jr., Member, Henrico County School Board; Rev. Walter Whitt,
Member, Henrico County School Board, Appellants.
Susan PAXMAN et al., Appellees,
v.
Clarence S. McCLURE, Division Superintendent, Albemarle
County Public Schools; Comer Smith, Member, Albemarle County
School Board; Douglas White, Member, Albemarle County School
Board; Allen Kindrick, Member, Albemarle County School
Board; Carl M. Van Fossen, Member, Albemarle County School
Board; H. Edward Chapman, Member, Albemarle County School
Board; Rodger Rinehart, Jr., Member, Albemarle County School
Board, Appellants.
Susan PAXMAN et al., Appellees,
v.
SCHOOL BOARD OF THE CITY OF STAUNTON, VIRGINIA, Appellant,
Virginia School Board Association, Amicus.
Susan PAXMAN et al., Appellees,
v.
Mary Anne LECOS, Anthony T. Lane, Mona Blake, John A.
Christians, Ruth H. Dell, Samuel L. Eure, Jr., Alfred S.
Hodgson, Robert G. Hunt, Ann Kahn, Rodney F. Page, and Marie
B. Travensky, individual members of the Fairfax County
School Board, Appellants,
Virginia School Board Association, Amicus.
Susan PAXMAN et al., Appellees,
v.
VIRGINIA BEACH, Virginia City School Board and their
constituent members, Appellants.
Susan PAXMAN et al., Appellees,
v.
Mary Anne LECOS, Anthony T. Lane, Mona Blake, John A.
Christians, Ruth H. Dell, Samuel L. Eure, Jr., Alfred S.
Hodgson, Robert G. Hunt, John A. Goldsmith, William E.
Perklik, William S. Hoofnagle, Walter Kurylo, Nathanial J.
Orleans, David J. Pattison, John F. Pearson, Lenora
Plissner, Jeffery O. Wellborn, William B. Wrench, Rufus
W. Wright, Gene S. Bergoffen, Daniel R. Ross, Thomas Bradley
Shipp, and Paul Freeman, Appellants.
Susan PAXMAN et al., Appellees,
v.
VIRGINIA BEACH, Virginia City School Board, and the
Chesapeake, Virginia City School Board and their
constituent members, Appellants.
Susan PAXMAN et al., Appellees,
v.
Clarence S. McCLURE, Comer Smith, Douglas White, Allen
Kindrick, Carl M. Van Fossen, H. Edward Chapman,
and Rodger Rinehart, Jr., Appellants.
Susan PAXMAN et al., Appellees,
v.
Robert C. BEAM, Jr., Gerald L. Biehn, Thomas W. Dixon,
George A. LaCas, William B. Obenschain, C. S. Peeler, D. W.
Pemberton, Virginia G. Shipplett, John Chiles, A. Erskine
Sproul, and Robert H. Truxell, being persons who were or
are, during the period December 6, 1969 to June 25, 1975,
members of the Staunton, Virginia City School Board, in
their individual and official capacities, and the School
Board of the City of Staunton, Virginia, Appellants.
Susan PAXMAN et al., Appellees,
v.
Dr. W. E. CAMPBELL, Mrs. John Deusebio, Cecil Childress,
Mrs. Betty McMullin, Cecil F. Jones, Jr., Rev.
Walter Whitt, and Oliver J. Sands, Jr.,
Appellants.
 
 Nos. 75-1506-75-1508, 75-1678, 75-1679, 75-1751, 75-1792,
75-1948, 75-1951, 75-1963, 75-1973, 75-1989 and 75-1990.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 14, 1978.
Decided Jan. 2, 1980.
 James L. Sanderlin, Richmond, Va. (Warren E. Zirkle, McGuire, Woods & Battle, Richmond, Va., on brief), Thomas J. Cawley, Fairfax, Va. (McCandlish, Lillard, Church & Best, Fairfax, Va., on brief), Richard C. Hotvedt and Harry A. Rissetto, Morgan, Lewis & Bockius, Washington, D. C.; Andrew J. Ellis, Jr., Mays, Valentine, Davenport & Moore, Richmond, Va.; Benham M. Black, City Atty., Staunton, Va.; William G. Broaddus, County Atty., for Henrico County, John L. Knight and Michael K. Jackson, Asst. County Attys.; George B. Little, James K. Cluverius, John S. Graham, III, Browder, Russell, Little, Morris & Butcher, Richmond, Va., on brief, for appellants.
 Philip J. Hirschkop, Alexandria, Va. (John B. Mann, Richmond, Va., on brief), for appellees.
 Frederick T. Gray, Walter E. Rogers, Robert L. Musick, Jr., Williams, Mullen & Christian, Richmond, Va., on brief, for amicus curiae Virginia School Boards Ass'n.
 Martin J. Flynn, Richard M. Sharp, Frederick C. Schafrick, Shea & Gardner, David Rubin, Washington, D. C., Michael W. Smith, Richmond, Va., on brief, for amici curiae Nat. Ed. Ass'n and the Virginia Ed. Ass'n.
 Before HAYNSWORTH, Chief Judge, WINTER, BUTZNER, RUSSELL, WIDENER, HALL and PHILLIPS, Circuit Judges.
 PER CURIAM:
 
 
 1
 * All of the members of the court except Judge Phillips concur in parts I, II, III, and IV of Judge Widener's opinion. Judge Phillips concurs in parts I, III, and IV of that opinion and concurs in the result in part II thereof, but for reasons expressed in his separate opinion.
 
 II
 
 2
 Four judges would deny monetary relief.
 
 
 3
 As to Mrs. Gough, Judges Russell and Widener concur in part V of Judge Widener's opinion and would deny monetary relief for the reasons expressed therein. As to Mrs. Paxman, Judge Russell would deny all relief to her for the reasons expressed in his separate opinion, while Judge Widener would deny monetary relief to her for the reasons expressed in part V of his opinion.
 
 
 4
 Judges Haynsworth and Phillips concur in the denial of monetary relief for the reasons expressed in their separate opinions.
 
 
 5
 Judges Winter, Butzner, and Hall dissent from part V of Judge Widener's opinion and would grant monetary relief for the reasons expressed in Judge Winter's opinion. For the same reasons, they do not agree with Judges Haynsworth and Phillips in the reasoning for their votes to deny monetary relief. Neither do they agree with Judge Russell's reasons for denying monetary relief to Mrs. Paxman.
 
 III
 
 6
 Four judges would grant reinstatement. Judges Winter, Butzner, Widener, and Hall concur in part VI of Judge Widener's opinion and would grant reinstatement for the reasons expressed therein.
 
 
 7
 Judge Haynsworth and Judge Phillips dissent from part VI of Judge Widener's opinion for the reasons expressed in their opinions. They would not grant reinstatement.
 
 
 8
 While Judge Russell agrees with the principles expressed in part VI of Judge Widener's opinion, he dissents from the result reached therein for the reasons expressed in his separate opinion.
 
 IV
 
 9
 All the members of the court concur in that part of part VII of Judge Widener's opinion which remands to the district court the question of attorneys' fees in that court.
 
 
 10
 Four judges would remand the case for ascertainment of an appellate attorneys' fee in excess of $500.
 
 
 11
 Judges Winter, Butzner, and Hall believe the $500 appellate attorneys' fee mentioned in part VII of Judge Widener's opinion is grossly inadequate. They would remand for ascertainment of an appellate attorneys' fee in excess of $500 for the reasons set forth in part III of Judge Winter's opinion in which they concur.
 
 
 12
 Judge Haynsworth also believes the appellate attorneys' fee mentioned in Judge Widener's opinion is inadequate. He would remand for the ascertainment of such attorneys' fees for the reasons set forth in his opinion.
 
 
 13
 Judges Russell, Widener, and Phillips would grant an appellate attorneys' fee of $500 as set forth in part VII of Judge Widener's opinion.
 
 
 14
 The mandate of this court will require that the case be remanded for action not inconsistent with this opinion, and, in addition, upon remand, the district court will inquire into and ascertain appropriate appellate attorneys' fees for the plaintiffs' attorneys as set forth in part III of Judge Winter's opinion and part IV of Judge Haynsworth's opinion.
 
 
 15
 All the members of the court concur in this per curiam opinion.
 
 
 16
 The judgment of the district court is accordingly
 
 
 17
 AFFIRMED IN PART, REVERSED IN PART, and REMANDED.
 
 WIDENER, Circuit Judge:
 
 18
 This litigation arises out of allegedly unconstitutional maternity leave policies enforced by the Albemarle and Henrico, County, Virginia school boards in 1971. Appellees, Susan Paxman and Leslie Gough, brought a class action under 42 U.S.C.A. § 1983[1] on behalf of all pregnant public school teachers in Virginia. They sought declaratory and injunctive relief, as well as back pay, claiming that their teaching contracts were terminated in violation of the due process and equal protection clauses of the Fourteenth Amendment. Relief was sought against the school boards as well as their members, both in their official and personal capacities, as representatives of a class of defendants ultimately defined by the district court as consisting of "all persons who were or are, during the period December 6, 1969 to June 25, 1975, members of a public county or city school board of the Commonwealth of Virginia which required that a pregnant school teacher cease her teaching at some time during the period of pregnancy other than a time of her own choosing."
 
 
 19
 From a judgment of the district court permitting this suit to be maintained as a class action under FRCP 23(b)(2) and granting broad monetary and injunctive relief against the defendant members of school boards in both their official and personal capacities this appeal was taken.
 
 
 20
 For reasons that follow, we reverse the district court's judgment permitting this suit to proceed as a class action under Rule 23(b)(2). We also reverse the district court's granting of monetary relief against the named defendants in either their official or personal capacities. We affirm, however, the holding below that the maternity leave policies under which Mrs. Paxman and Mrs. Gough were required to leave their jobs violated the due process clause of the Fourteenth Amendment, and hold that injunctive relief, in the form of reinstatement, is available against the Division Superintendents and members of the Henrico and Albemarle County School Boards in their personal capacities.[2]
 
 
 21
 * The facts are rather uncomplicated and are similar in all material respects for each of the appellees. Susan Paxman was an English teacher employed by the Albemarle County School Board. On May 6, 1971, she signed an employment contract for the 1971-72 school year. Shortly thereafter, she discovered she was pregnant, and, on July 26, 1971, was notified by the Chairman of the Albemarle High School English Department that she would have to terminate her contract in accordance with school policy requiring immediate termination if pregnancy occurred prior to the start of the school year.[3] On August 9, Mrs. Paxman appeared before the school board to request that she be permitted to perform her contract. She introduced a letter from her doctor, indicating her fitness to teach until the termination of her pregnancy. Nevertheless, the following day she was formally notified that her contract would be terminated in accordance with standard policy.
 
 
 22
 On April 30, 1971, Leslie Gough signed a contract with the Henrico County School Board to teach mathematics during the 1971-72 school year. She informed the School Board of her pregnancy on about October 1, 1971, and requested permission to complete the semester. On October 6, 1971, she was notified that her contract would be terminated as of November 23 under a policy deeming pregnancy of four months' duration sufficient cause for termination.[4] Mrs. Gough, too, introduced a physician's letter indicating her fitness to continue teaching. She was ultimately allowed to continue until December 17 because of the difficulty of finding a replacement, but was not permitted to finish the semester.[5]
 
 
 23
 On December 6, 1971, this suit was filed in the district court. It was conditionally certified as a class action by the district court on October 30, 1972, with the defendant class composed of all public, county, and city School boards in Virginia with mandatory maternity leave policies. On November 15, 1972, arguments were heard on motions for summary judgment, and, in its order dated November 22, 1972, the district court entered summary judgment in favor of the plaintiff class. In that same order, the district court determined that the suit should be maintained as a class action under FRCP 23(b)(1).[6]
 
 
 24
 On January 15, 1973, this court, sitting en banc, reversed an earlier panel decision in Cohen v. Chesterfield County School Board, 474 F.2d 395 (4th Cir. 1973), and upheld the constitutionality of a maternity leave policy substantially similar to the ones involved in this case. The district court properly overruled itself and entered summary judgment in favor of the defendant class. That judgment was stayed, however, pending final disposition of the Cohen case by the Supreme Court.
 
 
 25
 On January 21, 1974, that Court reversed our decision in Cohen and held certain mandatory maternity leave policies, not substantially dissimilar to those in question here, violative of the due process clause of the Fourteenth Amendment. Cleveland Board of Education v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). The district court then re-entered its grant of summary judgment for the plaintiffs in the instant case, and at the same time, in the same order modified its previous rulings in two respects that are critical to certain aspects of the disposition of this appeal. First, it amended the defendant class to consist of Members of school boards rather than school boards themselves.[7] Secondly, it modified the class action designation of this suit, Sua sponte, as coming within Rule 23(b)(2), rather than 23(b)(1), on the ground that primarily equitable relief was involved. If the matter of designating the case a class action under FRCP 23(b)(3) was ever considered, we do not find it.
 
 II
 
 26
 A class action is maintainable under Rule 23(b)(2) if the four requirements of Rule 23(a)[8] are met, and if
 
 
 27
 "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole." FRCP 23(b)(2).
 
 
 28
 As is clear from the language of the Rule, it is applicable to situations in which a class of plaintiffs seeks injunctive relief against a single defendant the Party opposing the class who has acted on grounds generally applicable to the plaintiff class. See Judicial Conference Advisory Committee, Notes to Rule 23(b)(2), 39 F.R.D. 69, 102 (1966). To proceed under 23(b)(2) against a class of defendants would constitute the plaintiffs as "the party opposing the class," and would create the anomalous situation in which the plaintiffs' own actions or inactions could make injunctive relief against the defendants appropriate. Wright and Miller, Federal Practice and Procedure, Civil, § 1775 at 21-22 (1972), states the proposition:
 
 
 29
 It should be noted that the injunctive relief must be sought in favor of the class. As a result, an action to enjoin a class from pursuing or failing to pursue some course of conduct would not fall under Rule 23(b)(2) and would have to qualify under Rule 23(b)(1) or Rule 23(b)(3) in order to be given class action treatment.
 
 
 30
 To the same effect is the 1978 pocket part of the text. We do not feel that the presence of a plaintiff class in this action alters our construction of the Rule, for, in addition to the literal language of Rule 23(b)(2), we rely upon the clearly expressed purpose for which the Rule was adopted:
 
 
 31
 Subdivision (b)(2). This subdivision is intended to reach situations where a party has taken action or refused to take action with respect to a class, and final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate. Judicial Conference Advisory Committee, Notes on Rule 23(b)(2), 39 F.R.D. 69, 102 (1966).
 
 
 32
 We therefore hold that the district court erred in certifying this case as a class action under Rule 23(b)(2), and direct that the unnamed members of the defendant class be dismissed (that is, all defendants except those connected with Albemarle and Henrico Counties), such dismissal, however, being without prejudice as to the merits of the controversy.[9]
 
 
 33
 Such action renders unnecessary our consideration of whether summary judgment was entered against those defendants in the court below without meeting the fundamental requisites of due process of law. Members of the school boards other than Albemarle and Henrico strenuously argue that they were not notified of the suit until after summary judgment had been entered against them on the merits of the case.[10] See Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565 (1877); Goldberg v. Kelly, 397 U.S. 254, 267, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). We do not reach that question here. Ashwander v. TVA, 297 U.S. 288, 341, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Mr. Justice Brandeis concurring).
 
 
 34
 Whether a class action by classes of plaintiffs could have been maintained against the Albemarle and Henrico defendants does not appear from the record. The plaintiffs did not attempt to establish that such a class would be sufficiently numerous under Rule 23(a), and the district court did not enter a class certification under Rule 23(c)(1) with respect to such a class.
 
 
 35
 The plaintiffs have the burden of establishing that the requisites of Rule 23(a) are met before they may proceed as class representatives. Carracter v. Morgan, 491 F.2d 458, 459 (4th Cir. 1973); Poindexter v. Teubert, 462 F.2d 1096 (4th Cir. 1972). We are of opinion, however, that a remand for a class action determination is not necessary to a fair disposition of potential claims arising out of the Henrico and Albemarle County maternity leave policies. In American Pipe & Construction Co. v. Utah, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), the Supreme Court held that
 
 
 36
 where class action status has been denied solely because of failure to demonstrate that 'the class is so numerous that joinder of all members is impracticable', the commencement of the original class suit tolls the running of the (statute of limitations) for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status. Id. at 552-53, 94 S.Ct. at 766.
 
 
 37
 We follow American Pipe and remand to the district court to entertain sympathetically motions for intervention under FRCP 24 for a reasonable period of time to be set by the district court for those members of the plaintiff class who taught in Henrico or Albemarle Counties.[11]
 
 III
 
 38
 Appellants' contention that the maternity leave policies under which Mrs. Paxman and Mrs. Gough lost their jobs were not constitutionally defective under Cleveland Board of Education, supra, does not need extended discussion. The district court found that the two policies contained the same "irrebuttable presumptions of unfitness" found unconstitutional by the Supreme Court. We agree, and, for reasons stated by the district court, affirm its judgment on that point. We note that Mrs. Paxman's and Mrs. Gough's pregnancies were to terminate during the school year, as did Mrs. Cohen's.
 
 IV
 
 39
 We next consider whether the district court erred in awarding monetary relief, in the form of back pay, against the individual defendants in their individual capacities. We hold that the defense of qualified immunity applies to this case and is sustained as a matter of law.
 
 
 40
 In Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the Supreme Court held that, where a suit for damages was brought against school officials by suspended students, those officials enjoyed an immunity from the imposition of personal monetary liability as long as they acted in the good faith discharge of their official duties. This rule of qualified immunity is grounded in policy considerations encouraging school officials to exercise independent discretion in daily decision making, free from the intimidating effect of knowing that a wrong decision made in good faith could result in personal financial loss. It also reflects a recognition that capable candidates for school board positions could well be deterred from serving if a contrary rule were to prevail. See Wood v. Strickland, supra, at 319-21, 95 S.Ct. 992; Scheuer v. Rhodes, 416 U.S. 232, 241-42, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). "(I)t is not a tort for government to govern." Dalehite v. United States, 346 U.S. 15, 57, 73 S.Ct. 956, 979, 97 L.Ed. 1427 (1953) (Mr. Justice Jackson dissenting).
 
 
 41
 We reject the distinction, urged by appellees, that, since they characterize the relief sought as equitable, the qualified immunity doctrine has no application. Assuming, Arguendo, that such characterization is correct, money would yet flow from the pockets of individual school board members to satisfy a judgment, and the policies enunciated in Wood are no less persuasive.
 
 
 42
 While school officials may not be able to avail themselves of ignorance or disregard of "basic, unquestioned, constitutional rights," Wood, supra, 420 U.S. at 322, 95 S.Ct. 992, neither should they be charged with bad faith for not anticipating the eventual outcome of constitutional issues over which, for an example especially applicable here, federal courts were differing. See Wood, p. 317, 95 S.Ct. 992. The Albemarle and Henrico County School Boards enforced a policy the validity of which was the subject of conflicting opinions in two United States Courts of Appeals, compare Cohen v. Chesterfield County School Board, 474 F.2d 395 (4th Cir. 1973), with LaFleur v. Cleveland Board of Education, 465 F.2d 1184 (6th Cir. 1972), not to mention the divided panel and en banc opinions of this court in Cohen, as well as the Supreme Court's division in LaFleur. It is also worth noting that both named school boards rescinded their maternity leave policies following the initial panel decision of this court declaring such policies unconstitutional. Under these circumstances, and in the absence of any evidence indicating a reason the rule should not apply, we are of opinion the good faith immunity defense is established as a matter of law. There is no indication the individual defendants "knew or reasonably should have known that the action(s) (t)he(y) took within the(ir) sphere of official responsibility would violate the constitutional rights of the . . . (plaintiffs), or that . . . (they) took the action . . . with . . . malicious intention." Wood, 420 U.S. p. 322, 95 S.Ct. p. 1001.
 
 V
 
 43
 The next issue before us is whether, under 42 U.S.C. § 1983, monetary relief in the form of backpay may be awarded from the school board's treasury by suing individual school board members in their official capacities. We hold that in the instant case it may not.
 
 
 44
 Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), held that school boards were "person(s)" within the meaning of § 1983 in the context of a suit for backpay. It also held that their members sued in their official capacities were such "person(s)." Monell, n. 55. By so ruling, the Court overturned its holding in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), that Congress had not intended that municipal corporations be included as "person(s)" within the meaning of the statute. Municipality liability can only result where a constitutional tort results "pursuant to official municipal policy of some nature." Monell, 436 U.S. at 691, 98 S.Ct. at 2036. The Court by so stating left intact that part of Monroe that rejected the presence of liability on the grounds of respondeat superior. It stated:We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.
 
 
 45
 436 U.S. at 694, 98 S.Ct. at 2038.
 
 
 46
 The Court in Monell, while rejecting the doctrine of absolute immunity for local governing bodies, refrained from commenting on the scope of any municipal immunity. Monell, supra, at 701, 98 S.Ct. 2018. Although that issue was not before it, the Court, in a separate part of the opinion devoted solely to the subject of immunity, chose to state: "(W)e express no views on the scope of any municipal immunity beyond holding that municipal bodies sued under § 1983 cannot be entitled to an absolute immunity, lest our decision that such bodies are subject to suit under § 1983 'be drained of meaning'." Monell, at 701, 98 S.Ct. at 2041.
 
 
 47
 Applying Monell to our case, the members of the school boards and school administrative offices sued in their official capacities are "person(s)" under § 1983 and are therefore subject to suit for their unconstitutional acts. The acts complained of here were the result of policies set out by the school boards involved. Therefore, the defendants are among those who may be liable under Monell. Burt v. Abel, 585 F.2d 613 (4th Cir. 1978).[12]
 
 
 48
 The remaining issue, then, is whether the Court's decision in Monell leaves available any qualified immunity as a bar to liability of a school board official sued in his official capacity. We think that it does.
 
 
 49
 Prior to Monell, we had held in Eslinger v. Thomas, 476 F.2d 225 (4th Cir. 1973), that good faith immunized a state official sued only in his official capacity from liability for money damages. Eslinger was a case in which a female student at the University of South Carolina was deprived of employment as a page in the South Carolina Senate because of her sex. She brought suit against the State Senators and various officers of the State Senate, including Thomas, the Clerk thereof. She did not sue Thomas in his individual capacity, rather only in his official capacity as Clerk of the Senate. 340 F.Supp. 866, 890, 895. We held that the clerk was ". . . acting in good faith and, we agree, should not be liable for damages." 476 F.2d at 228. We reasoned that ". . . in the area of sex-discrimination, the inchoate state of legal guidelines suggests that good faith, coupled with reasonable grounds to believe one is acting within the law, should be sufficient to preclude liability for damages. (Footnote omitted) Properly applied, such a test, based on the circumstances of each case, maintains the effectiveness of § 1983 actions, while providing conscientious state officials with some protection against the cutting edge of a rapidly developing legal doctrine." 476 F.2d at 229. While we did require the district court to give injunctive and declaratory relief in Eslinger, the only money item sued for was $40 per week ". . . wages as a result of the defendants' discriminatory refusal to hire her as a page." 340 F.Supp. at 889. We stated that no question of reinstatement was involved in the case, and the damage claim, although labeled as one for backpay, was independent from plaintiff's claim for injunctive relief to ban invidious sex classifications in the hiring of pages. 476 F.2d at 230, n. 10. We see no distinction between lost wages as a result of an unconstitutional resolution of the South Carolina State Senate and lost wages as a result of an unconstitutional resolution of a school board, whether the lost wages be called backpay or damages. The Court, in Monell, we think has ended any distinction, sometimes made, between backpay and money damages, for it described the "backpay," sued for as "equitable relief," Monell, 436 U.S. p. 662, 98 S.Ct. 2018, as "monetary . . . relief," Monell, p. 690, 98 S.Ct. 2018. As in Eslinger, in Monell there was no question of reinstatement. Bertot, infra, pp. 249-250, is in accord.
 
 
 50
 Few courts have ruled on the issue of the existence of good faith immunity as a defense to a § 1983 suit since the decision in Monell. A search of the circuits finds only a handful of cases discussing this matter. Those courts which have ruled on the issue support our belief that the defense of good faith immunity must be made available to municipal government officials acting in their official capacities.
 
 
 51
 In Bertot v. School District No. 1, Albany Co., 613 F.2d 245 (10th Cir. 1978), over a dissent, the court held that a school district was immune from monetary damages on the ground that the school district and its members, acting in their official capacities, acted in good faith. The court there reasoned that if the doctrine of qualified immunity for good faith actions were available to officers acting in their individual capacities, it should likewise be available to the board collectively and its members acting in official capacities. The reasons compelling the good faith immunity are just as compelling in all instances, the individuals are the same, and the restrictions on independent judgment are the same, the court said.[13] Accordingly the court refused to overturn the trial court's decision refusing recovery for the plaintiff on a jury finding that the officials had acted in good faith.
 
 
 52
 In Owen v. City of Independence, Mo., 589 F.2d 335 (8th Cir. 1978), cert. granted, --- U.S. ----, 100 S.Ct. 42, 62 L.Ed.2d 28 (1979), the court construed Monell to imply the Local governing bodies may assert a limited immunity defense in § 1983 suits brought against them. Here, the court concluded that although the defendant city had stigmatized the plaintiff, a former police chief, through the city's actions regarding the plaintiff's firing and subsequent grand jury investigation, and as a result had violated the plaintiff's constitutional rights, the plaintiff could not recover backpay from the city because the city and its officials had acted in good faith. The court recognized the validity of a defense of good faith immunity to cover both individual defendants and the city as well, insulating them from monetary liability. Owens, supra, at 338.
 
 
 53
 In Ohland v. City of Montpelier, 467 F.Supp. 324 (D.Vt.1979), the district court of Vermont applied the good faith immunity defense to local governing bodies. The court reasoned that the arguments in favor of strict governmental liability are not stronger than those in favor of vicarious liability which was specifically rejected by the Court in Monell. The court further reasoned that both the legislative history of § 1983 and the unique problems inherent in the public sector require the insulation of government from monetary responsibility for acts done with no knowledge that those acts may later be ruled unconstitutional in the same manner as individuals would be so protected.
 
 
 54
 The district court of Maryland in Gross v. Pomerleau, 465 F.Supp. 1167 (1979), held the defense of good faith immunity was available to local governing bodies and their members acting in their official capacities. Relying upon O'Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), and Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the court noted that the Court's holding in Monell, that municipalities could be sued, did not mean that they could not avail themselves of the defense of good faith immunity that is necessary for the continuation of government operating vigorously for the public interest.
 
 
 55
 All of these decisions support this court's ruling in Eslinger and illustrate that Monell should not disturb our reasoning there. There, to repeat, in a § 1983 case, we held that the Clerk of the South Carolina Senate, sued in his official capacity, was not liable for damages while acting in good faith pursuant to a resolution of the South Carolina Senate. We conclude that Monell does not overturn that decision. Therefore, we think that Eslinger is persuasive and do not depart from it here. As a result, under Eslinger, the plaintiffs are not entitled to monetary relief in the form of backpay because the defendant school board officials acted in good faith. Nowhere in the record is there any indication that the defendants were acting in other than good faith coupled with reasonable grounds to believe they were acting within the law. Eslinger at 229.
 
 
 56
 The Court in recent years has decided that a variety of public officials are entitled to a degree of immunity if their work is to go forward. E. g., Procunier v. Navarette, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Those and other cases are based on the reasons that public decision makers should not bear the burden of mistakes made in good faith in the course of exercising their discretion; that a too rigid standard of liability would inhibit their actions which are necessary for the public good; that the good faith fulfillment of their responsibilities within the bounds of reason will not be punished; and that they should not exercise their discretion with undue timidity. Wood established such an immunity defense for members of school boards and quoted Scheuer as follows, 420 U.S. at p. 321, 95 S.Ct. at p. 1000:
 
 
 57
 "Public officials, whether governors, mayors or police, legislators or judges, who fail to make decisions when they are needed or who do not act to implement decisions when they are made do not fully and faithfully perform the duties of their offices. Implicit in the idea that officials have some immunity absolute or qualified for their acts, is a recognition that they may err. The concept of immunity assumes this and goes on to assume that it is better to risk some error and possible injury from such error than not to decide or act at all."
 
 
 58
 Wood went on to establish a two-prong test for ascertaining whether or not school board members should receive a limited immunity for their official acts, and, although that was in the context of student discipline, we see no reason it should not apply here. The rule is that a member of a school board is entitled to immunity in a suit for damages if he is acting sincerely and with a belief that he is doing right, but he is "not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student. That is not to say that school board members are 'charged with predicting the future course of constitutional law.' A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clear established constitutional rights that his action cannot reasonably be characterized as being in good faith." 420 U.S. at 322, 95 S.Ct. at 1001.
 
 
 59
 While it may be true that there is additional reason to extend immunity to school board members sued in their individual capacities than those sued only in their official capacities, the fear of having to pay a judgment out of personal resources being an added consideration, we, nevertheless, do not believe that the additional reason to grant a defense of good faith immunity to a school board member sued in his individual capacity detracts from the reasons we have mentioned, which apply equally to the member whether sued in his individual or representative capacity. As one court has pointed out, a conscientious school board member will hesitate to act if he knows that his actions, although taken in the utmost good faith and belief in their validity, may subject the board or municipality which he serves to extensive financial liability, and this is especially true when we consider that municipal treasuries are of limited resources.
 
 
 60
 Perhaps the best reasoned analysis of this problem we have found is in Ohland, at p. 345, which we quote and endorse:
 
 
 61
 "We hesitate to extend the logic of strict liability in the realm of private enterprise to the governmental arena. Taxpayers are not private investors willingly accepting the risks of doing business in return for anticipated profits. Moreover, governments, unlike private business, cannot choose to avoid acting in areas of greater risk. Nor can governments minimize liability for constitutional torts by engaging in 'product development' or improved procedures when the contours of future constitutional decisions are unknown, and the rights of different groups of possible plaintiffs are potentially in conflict." (Citations omitted)
 
 
 62
 "Because so many governmental decisions affect large numbers of potential plaintiffs, a rule of retroactive liability would pose a substantial threat to the quality and efficiency of governmental decisionmaking. The losses that some persons may be forced to bear because a court's finding of unconstitutionality comes too late are not fundamentally different from the losses that many individuals bear as a result of governmental decisionmaking in the areas of health and safety and economic regulation. (Citation omitted) In all these cases, absent an explicit legislative determination that these losses will be shared, they should be considered part of the accepted risk attending governmental decisionmaking in a complex society."[14]
 
 
 63
 Applying the Wood test, then, to the facts in this case, there is no evidence at all of any impermissible motivation on the part of any defendant in entering into or administering the contracts involved. The federal circuits were divided on the question, as was this court. No rule of settled indisputable law was established on the subject until LaFleur, and before the decision in LaFleur both Henrico and Albemarle Counties had revoked their previous pregnancy regulations following our panel opinion, and did not even attempt to reinstate them when that opinion had itself been overruled by the en banc court. Malicious intention on the part of the defendants is not even claimed, and, if it were, there is no evidence to support it.
 
 
 64
 Accordingly, we are of opinion and hold that the defendant school officials connected with Henrico and Albemarle Counties, in their official capacities, are immune from the claims of backpay because they acted in good faith without knowledge that the acts they took would violate the constitutional rights of the plaintiffs, and because they did not act with malicious intent.14a
 
 VI
 
 65
 As we have noted, Monell decided that a municipality (school board) in a suit for backpay was a "person" within the meaning of 42 U.S.C. § 1983. As well, it decided that in such suits individual members of the school board sued in their official capacities were such "person(s)". The case went on to state that local governing bodies can be sued directly under § 1983 for monetary, declaratory, or injunctive relief, as can local government officials be sued in their official capacities in those cases in which the local government could be sued. 436 U.S. p. 690 and note 55, 98 S.Ct. 2018.[15]
 
 
 66
 Were these statements of the Court not enough, we think the individual defendants involved here may be required to perform their official duties in a constitutional manner under Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).
 
 
 67
 In our case, the unconstitutional policies relating to dismissal or leave for pregnancy have been rescinded, so they are moot. There is no indication the policies will be reinstated. But the question remains as to whether Mrs. Paxman and Mrs. Gough should have been offered reinstatement to their teaching positions, which, of course, is equitable relief and is prospective.
 
 
 68
 In Ex parte Young, the Attorney General of Minnesota was enjoined to conform his future conduct of that office to the requirements of the Fourteenth Amendment. The relief there "was prospective only." Edelman v. Jordan, 415 U.S. 651, 664, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). When an official acts under color of state law in a manner which violates the Constitution, " . . . he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." Young, 209 U.S. p. 160, 28 S.Ct. p. 454. We see no difference between Ex parte Young and the case at hand. The officials here, acting in good faith under color of state law, have, as municipal officials, nevertheless acted in an unconstitutional manner. They should be stripped of their "official or representative character," Young, p. 160, 28 S.Ct. 441, and required to "conform" their "future conduct of . . . office," Edelman, 415 U.S. p. 664, 94 S.Ct. 1347, to the requirements of the Constitution. The individual defendants, conforming their conduct of office to the requirements of the Constitution, must offer reinstatement[16] to Mrs. Paxman and Mrs. Gough at the first available opportunity, upon their written requests, which will not affect the continuity of instruction. See LaFleur, 414 U.S p. 648-650, 94 S.Ct. 791; Bertot, p. 250. Such requests should be made within a reasonable time.
 
 VII
 
 69
 While the defendants have substantially prevailed in these appeals, we think the plaintiffs are entitled to an attorney's fee, from the Henrico and Albemarle defendants, in the amount of $500, for defending their reinstatement on appeal, for in that one aspect they prevailed.
 
 
 70
 On remand, the district court will decide the question of attorneys' fees for the proceedings in that court. See Burt, p. 617-618; Bonnes v. Long, 599 F.2d 1316 (4th Cir. 1979).
 
 
 71
 HAYNSWORTH, Chief Judge, concurring and dissenting:
 
 
 72
 I concur in the denial of damages, but for reasons that differ from those expressed by my brothers. I dissent from the affirmance of the reinstatement order.
 
 
 73
 I agree there should be a qualified immunity for members of school boards sued in their official capacities from claims for damages. I do not agree that there is any such immunity from awards of back pay incident to the equitable remedy of reinstatement.
 
 
 74
 I think that reinstatement is wholly inappropriate and unwarranted in these cases and that the claims, while measured by lost pay, as in Monell, are claims for damages from which the qualified immunity is present.
 
 
 75
 I do not think that Mrs. Paxman has any constitutional claim for any relief.
 
 I.
 
 76
 As long ago as Smith v. Hampton Training School for Nurses, 360 F.2d 577 (4th Cir. 1966), it appears to me to have been settled that when reinstatement was an appropriate equitable remedy, the related remedy of a back pay award was available. That was the decision of a unanimous En banc court, and, until now, it has been consistently followed and applied in suits against defendants sued in their official capacities as shown by the cases cited in the opinion of Judge Winter.
 
 
 77
 Of course, we can depart from the rule established for this court by our En banc decision in 1966 if the Supreme Court, in effect, has directed us to do it. I do not read Monell as having done that.
 
 
 78
 Monell did not involve a claim for reinstatement, as recognized in Judge Widener's opinion. Though measured by lost wages, it was simply a claim for damages, as is clearly and explicitly stated in the last paragraph of Judge Gurfein's opinion. Monell v. Dept. of Soc. Services, 532 F.2d 259, 267 (2d Cir. 1976). In the Supreme Court, the opinions are not so explicit in characterizing the claim. We know from an opinion from the Second Circuit what it was, however, and it is perfectly apparent that the Supreme Court in Monell was not wrestling with a problem of a back pay remedy in the context of a valid claim for reinstatement. Hence, I cannot read Monell as saying that this court was wrong in its earlier cases differentiating between legal and equitable remedies and treating a back pay claim as an equitable one when sought in conjunction with a valid claim for reinstatement.
 
 
 79
 The thrust of Monell was to enlarge the remedies available to plaintiffs such as these when suing officials such as these school board members in their official capacities. It struck down what theretofore had been thought an absolute immunity. That thrust seems to be quite inconsistent with a reading that the Supreme Court, in passing, proscribed a remedy which theretofore had been thought generally available.
 
 
 80
 Thus, if there were a valid claim for reinstatement here, I think that lost back pay should also have been awarded.
 
 II.
 
 81
 This is not a case in which reinstatement is appropriate, however. The Supreme Court, in Cleveland Board of Education v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), found unconstitutional maternity leave regulations requiring termination of the teacher's employment at a fixed time preceding the expected date of delivery. Such a regulation was said to impermissibly burden a teacher's decision to bear children and to set up an irrebuttable presumption that, after so many months of pregnancy, a teacher was physically unable to continue teaching.
 
 
 82
 The two school boards had attempted to justify their pregnancy employment termination regulations on the basis of, among other things, service of the interest in continuity of instruction. Each of the school teachers in LaFleur, however, had discovered her pregnancy only after commencement of the school year, and the termination of her employment was scheduled to occur within that school year. Of course, the Supreme Court effectively demonstrated that the longer period of teaching by the pregnant teacher would serve the interest of continuity in instruction substantially better than the school board's rules.
 
 
 83
 In LaFleur, the Supreme Court also considered post-delivery maternity leave rules. The Cleveland rules provided that, after delivery of her baby, the young mother might request a return to service provided it were done in writing at least six weeks before the beginning of a semester. She was not assured reemployment, but the rule provided for priority in reassignment to a vacancy for which the teacher was qualified. As Cleveland's rule, Chesterfield County's rule required proof of physical fitness. It also required assurance that the child's care would no more than minimally interfere with job responsibility. It, however, guaranteed reemployment no later than the first day of the school year following declaration of the teacher's eligibility for reemployment.
 
 
 84
 These reemployment rules were upheld under constitutional scrutiny. Cleveland had a provision that a teacher could not request reassignment until her baby was three months old. That provision was stricken, but the rest of the two sets of rules were held proper and enforceable. In this case, Albemarle County's rule simply provided for a return from pregnancy leave at a time mutually acceptable to the teacher and the administration. That seems as much of a commitment to the teacher as Cleveland's provision for priority in reassignment at the commencement of a semester at least six weeks after the request for reassignment. Henrico County's regulation simply provided for the lapse of a period of sixty days after the birth before the teacher could be recontracted, the sixty day provision being invalid under LaFleur. It required a medical statement of the teacher's physical fitness. As in Cleveland's rule, the rules have contained no explicit guarantee of reemployment, but reemployment was clearly the contemplation of the rules of both the school districts involved in this case.
 
 
 85
 There is in this case no showing of any failure to comply with any reemployment commitment. Neither teacher sought post-birth reemployment, and neither was wrongly denied it. Under these circumstances, "reinstatement" to a position never sought seems entirely inappropriate.
 
 
 86
 If we are now to hold that there is any constitutional right to reemployment, beyond the state law right to enforcement of the reemployment rules according to their reasonable intendment, we will be forging new ground in a case in which it has not been overtly asserted, argued or considered.[1] If we are to hold that a childbearing mother has a constitutional entitlement to reemployment after delivery of her child, it should be done only after careful consideration upon a record, containing findings of fact, which reasonably presents the question for consideration. There is no such record here. There being no showing of a violation of a constitutional right to reemployment, there was no showing of a right to reinstatement.
 
 
 87
 Since the claim for lost pay is not pendant to any claim for reinstatement, the qualified immunity defense should be available.
 
 III.
 
 88
 As to the measure of the qualified immunity, I find myself in general agreement with the opinion of Judge Phillips.
 
 
 89
 There is substantially less reason for a qualified immunity for members of a school board sued in their official capacities than there is when they are sued in their individual capacities. Subjective good faith may be the appropriate standard in the latter situation, but something more ought to be requisite in the former. There can be subjective good faith in the presence of unreasonableness and even foolishness. When defendants are sued in their official capacities, the standard should be one of good faith coupled with a standard of reasonableness which may include the performance of reasonable steps to obtain information and advice upon which to make an informed judgment. That is not to say, however, that every wrong negligently inflicted by a municipal official is converted into a constitutional violation. The constitutional violation should be apparent before the problem of qualified immunity arises. Only then need one consider the possible difference between the qualified immunity available to a defendant sued in his individual capacity and that available to a defendant sued in his official capacity.
 
 
 90
 After Judge Phillips had prepared his opinion, a new issue of the Columbia Law Review was distributed. In it there is an article[2] by an attorney for the plaintiffs in Monell, who is a lecturer in law at Columbia, in which he advocates just such an immunity, based upon tort principles as suggested by Judge Phillips, for municipalities and members of their governing bodies when sued in their official capacities.
 
 
 91
 He suggests three exceptions to the qualified immunity rule. He would not allow it at all to the extent the municipality had been enriched by its violation of the Constitution or when the constitutional violation was also a clear violation of local law. He would create an absolute immunity if the constitutional violation arose out of an affirmative action program designed and operated in a good faith effort to conform to what was perceived to be the requirements of the Constitution. Of course, we are here concerned with no such possible exceptions, and I need not consider whether any one of the three should be recognized. I would embrace the basic principle that the immunity problem respecting municipalities and their officials should be approached in terms of tort principles after a determination, without resort to such principles, that there has been a deprivation of a constitutional right.
 
 IV.
 
 92
 I think Mrs. Paxman had no constitutional claim.
 
 
 93
 In the spring of the year she signed an employment contract for the next year, and she became aware of her pregnancy a few days later. She notified the school board, and weeks before the beginning of the new school year she was informed that her employment was to be terminated and that she would be replaced by a teacher who could be expected to teach through all of the next school year.
 
 
 94
 For a teacher known to be pregnant before the start of a school year, the Albemarle rule expressly provided for immediate termination. In LaFleur the Supreme Court recognized the importance of continuity in instruction. School boards may reasonably believe that the interest of the children is furthered by beginning the school year with a faculty each of whom may be expected to teach throughout the school year. When a teacher discovers her pregnancy only after the school year has commenced, there is inevitable discontinuity, and the only question addressed by the Supreme Court in LaFleur is the right of the teacher in that context to determine when the discontinuity will be experienced. I can find nothing in LaFleur to suggest that continuity of employment of a teacher of children cannot be considered by a school board and carry the day in favor of employment of some one else when the pregnancy is known well before the school year commences. Hence, I would hold that Mrs. Paxman suffered no constitutional wrong.
 
 V.
 
 95
 Even under my view, the declaratory relief granted was enough to make the plaintiffs prevailing parties. I agree that their lawyers are entitled to allowance of attorneys' fees. An award of $500 seems to me quite inadequate. I would remand to the District Court with instructions, after consideration of all relevant factors, to determine and allow a reasonable fee.
 
 
 96
 WINTER, Circuit Judge, with whom BUTZNER and HALL, Circuit Judges, join, concurring and dissenting:
 
 
 97
 We agree with the majority that, for the reasons it assigns, the district court's certification of the plaintiff and defendant classes and its entry of judgment against the defendant school board members in their individual capacities despite their qualified immunity should be reversed. We also agree that the named plaintiff schoolteachers and of other schoolteachers who are permitted to intervene as plaintiffs should be reinstated. Thus, we concur in Parts I-IV and VI of the majority opinion.* We cannot agree, however, that school board members sued in their official capacities are entitled to the same qualified immunity that they enjoy in their individual capacities, either as advanced in Part V of the majority opinion or in the concurring opinion. We would order a backpay award against them in that capacity. We also think that the attorney's fee award of $500 granted to plaintiffs' counsel by the majority is inadequate. Upon appropriate proof, we would grant a larger amount or we would remand this aspect of the case to the district court to fix a proper amount. Thus, from Parts V and VII of the majority opinion, we respectfully dissent, and we are, of course, in disagreement with the concurring opinion.
 
 I.
 
 98
 Although the plaintiff schoolteachers were dismissed from their positions in violation of their rights under the fourteenth amendment,[1] the majority holds in Part V of its opinion that the defendant school board members cannot be held liable for backpay in their official capacities. This holding proceeds from the majority's conclusion that a school board member or other local official, even when sued in an official rather than an individual capacity, is immune from liability for any monetary award if he acted in good faith[2] in violating the Constitution. The majority states that our past decisions have already reached this conclusion, relying upon Eslinger v. Thomas, 476 F.2d 225 (4 Cir. 1973). We do not think that Eslinger supports that proposition. To the contrary, in our view adherence to our past decisions would require us to reject any qualified immunity defense raised by the defendants in their official capacities. Moreover, examination and consideration of the principles and policies underlying the defense of qualified immunity lead us to conclude that the doctrine does not apply when the defendants are sued in their official capacities.
 
 
 99
 A. The Eslinger Case.
 
 
 100
 Eslinger was a suit by a female college student who had been denied temporary employment as a page of the South Carolina Senate on the basis of its policy to employ only males as pages. Although we held the policy to be unconstitutional and enjoined the clerk of the Senate from enforcing the policy in the future, we denied Eslinger's claim against the clerk for monetary relief in the amount she would have earned in the temporary position. Recognizing that the clerk had acted at a time when sex discrimination was not generally viewed as violative of the equal protection clause,[3] we held that the clerk was immunized by his good faith from an award of damages. Id. at 228-30.
 
 
 101
 The majority regards the issue decided in Eslinger as identical to the immunity issue before us in the instant case. We believe, however, that the majority reads Eslinger too broadly and that the instant case presents issues that were neither addressed nor decided in Eslinger. First, although the majority correctly states that Eslinger was a suit against the clerk of the Senate in his official capacity, it is significant that the majority, in supporting its statement about the capacity in which the clerk was sued, finds it necessary to cite the opinion of the district court in Eslinger.[4] Because we thought the fact of so little significance to the issues on appeal, we only obliquely mentioned and gave no express consideration to the fact that the clerk had been sued in his official capacity alone.[5] At a time when the law on the immunity of executive officers under 42 U.S.C. § 1983 was in a state of flux,[6] we devoted our attention to the nature of the "good faith" that was required for immunity, rather than to the differences between defendants sued in their individual capacity and those sued in their official capacity.
 
 
 102
 More importantly, Eslinger differs from the instant case in that it did not involve a claim for the equitable remedy of reinstatement with backpay. Plaintiff had never been employed as a page; she was not employed and then wrongfully discharged. Although the plaintiff in that case characterized the monetary relief she sought as "back pay," we viewed her claim, in the absence of any demand for reinstatement, as a claim for the legal remedy of damages. We expressly noted the relation between the nature of the claim for relief and the issue of the clerk's immunity in a footnote, Id. at 230 n.4, saying that the defense of immunity should not apply when backpay is sought. We also noted that in the cases relied upon by plaintiff to support her contention, backpay had been sought "not simply (as) a claim for damages, but rather (as) an integral part of the equitable remedy of reinstatement." Id. Since Eslinger had not sought reinstatement, we regarded her prayer for monetary relief as a "damage claim," Id., and on that basis we held that the good faith defense would apply.[7]
 
 
 103
 The case now before us presents the question whether a school board member, sued in his official capacity for equitable relief in the form of reinstatement and backpay, enjoys a qualified immunity for his unconstitutional dismissal of a teacher. Eslinger, which did not address the significance of an official capacity suit and which upheld an immunity defense on the ground that legal rather than equitable relief was sought, can hardly provide a complete answer to that question. That Eslinger should be so limited and was intended by us to be so limited is also shown by three cases that followed.
 
 
 104
 B. Post-Eslinger Cases.
 
 
 105
 Burt v. Board of Trustees, 521 F.2d 1201 (4 Cir. 1975), unlike Eslinger, required us to address in detail the differences between suits against defendants in an individual capacity and those against defendants in an official capacity. In a suit against members of a school board, the district court determined that the board had dismissed the plaintiff teacher in violation of her due process rights, and it awarded her backpay.[8] On appeal, we vacated the district court's decision and remanded the case for further proceedings. Our concern was that the district court had not made clear whether the judgment was entered against the defendants in their individual or their official capacities.[9] Judge Craven's opinion for the court[10] explained that the nature of relief to which the plaintiff teacher would be entitled depended on the distinction between individual capacity and official capacity suits:
 
 
 106
 (T)he named defendants possessed the power to reinstate and cause disbursement of back pay from public funds only in their Official capacities . . . . Private citizens are not empowered to reinstate or order back pay out of school board or county funds.
 
 
 107
 . . . If the defendants are liable in their individual capacities, the measure of damages would not be the equitable one of back pay but instead the value of the contract defendants wrongfully broke. . . . (W)hatever the amount, the award would clearly be money damages and not equitable in nature.
 
 
 108
 Id. at 1204.
 
 
 109
 Having explained this distinction, Judge Craven proceeded to define the tasks of the district court on remand. If the district court determined that the defendant school board members were sued in their official capacities, then its judgment against them for backpay, so clarified, could be reinstated. If, on the other hand, the district court determined that the suit was against the defendants in their individual capacities, then further proceedings would be necessary. The relief would be legal damages, rather than equitable backpay, and a jury trial would therefore be necessary. If a jury trial is held, Judge Craven noted, "(t)he defendants will be entitled to assert the defens(e) . . . that they possessed the qualified immunity from liability for damages as set out in Wood v. Strickland, 420 U.S. 308 (95 S.Ct. 992, 43 L.Ed.2d 214) (1975)." 521 F.2d at 1206. The holding of the court in Burt is thus clear: Only if a teacher sues school board members for Legal relief in their Individual capacities will the defense of qualified immunity be available.[11]
 
 
 110
 This holding was reaffirmed in Thomas v. Ward, 529 F.2d 916 (4 Cir. 1975). In that case, a schoolteacher claimed that he had been dismissed in violation of his due process rights, and he sued various education officials in both their official and individual capacities. Although the district court upheld the teacher's claim on the merits, it denied an award of backpay. The district court determined that the defendants, in their official capacities, could not be sued as "persons" under § 1983, and that in their individual capacities, they enjoyed a qualified immunity for actions taken in good faith. The plaintiff appealed only from the ruling regarding the official capacity suit. Citing Burt, we held that the officials could be sued in their official capacities under § 1983.[12] We therefore reversed the district court's decision in part and directed the entry of a backpay award. This award was ordered despite the finding of the district court, uncontested by plaintiff on appeal, that the defendants had acted in good faith and were therefore entitled to immunity in their individual capacities. Thus, as in Burt, we recognized that the defense of qualified immunity does not apply when backpay is sought from officials in their official capacities.
 
 
 111
 In Bursey v. Weatherford, 528 F.2d 483 (4 Cir. 1975), Rev'd on other grounds, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), we went further and held that officials sued in their official capacities cannot defend on the basis of qualified immunity, even when legal damages, rather than equitable relief, are sought. Bursey had been convicted in South Carolina for malicious destruction of property after an undercover agent of the South Carolina State Law Enforcement Division had participated in the offense and had posed as Bursey's codefendant and engaged in discussions with him outside the presence of counsel. The agent later testified against Bursey at the criminal trial. In a subsequent § 1983 action for damages, brought by Bursey against the agent and other state law enforcement officers in both their individual and official capacities, we held that Bursey's rights to effective assistance of counsel and to a fair trial had been violated.[13] Noting that the officials in their individual capacities could assert a qualified immunity, we remanded the case to the district court for factfinding on the issue of defendants' good faith. In a footnote, however, we added: "We note that if the suit against (defendants) in their representative capacities is not barred by the eleventh amendment, the defense that they acted in good faith is inapplicable." 528 F.2d at 488 n.8 (citing Thomas v. Ward, 529 F.2d 916 (4 Cir. 1975)).
 
 
 112
 In the case now before us, plaintiffs seek reinstatement with backpay from the defendant school board members in their official capacities. Whether the backpay sought is characterized as legal damages or equitable relief, our decisions in recent years consistently hold that defendants, in their official capacities, cannot invoke the defense of qualified immunity. Those decisions should supply the answer here. Certainly, they show that the majority's reliance on Eslinger, for a contrary result, is misplaced.
 
 
 113
 C. Principles and Policies of Qualified Immunity.
 
 
 114
 The majority seeks to support its recognition of defendants' good faith defense by examining the principles and policies underlying the defense of qualified immunity, and applying them to the instant case. We agree that this should be done. None of the opinions in Burt, Thomas, and Bursey contains any detailed analysis of the principles of qualified immunity or of the reasons for allowing or denying the defense in a given situation. In view of the change in the law of official capacity suits under § 1983 wrought by the Supreme Court decision in Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 201, 56 L.Ed.2d 611 (1978), it is proper to consider anew the applicability of the qualified immunity defense in official capacity suits.
 
 
 115
 We start with the two seminal cases, in which the Supreme Court has explained the elements of the defense of qualified immunity and the reasons for allowing an executive officer sued in his individual capacity under § 1983 to avail himself of the defense. In Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), the Court held that the governor of a state, the officers of the State National Guard, and the president of a state university could assert a qualified, but not absolute, immunity only for actions taken in good faith. The Court explained that this qualified immunity was based on two "mutually dependent rationales":
 
 
 116
 (1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good.
 
 
 117
 Id. at 240, 94 S.Ct. at 1688. The Court thus saw as the two justifications for qualified immunity the unfairness of imposing personal liability on an officer for the innocent exercise of the duties conferred upon him by law and the chilling deterrent effect upon the exercise of such duties that the threat of liability would create.
 
 
 118
 A year later, in Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the Supreme Court found the dual rationales of Scheuer, particularly the deterrence rationale, to justify extension of the qualified immunity defense to school board members sued for damages in their individual capacities. At the same time, the Court clarified the nature of the defense, explaining that it contained both a "subjective" and an "objective" element of good faith:
 
 
 119
 (A) school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student. . . . A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith.
 
 
 120
 Id. at 322, 95 S.Ct. at 1001.
 
 
 121
 These decisions, at the time that they were announced, clearly had no application to suits against municipalities or similar units of local government, because at that time the prevailing law held that a municipality was not a "person" subject to suit under § 1983. Monroe v. Pape, 365 U.S. 167, 187-92, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). This aspect of Monroe, however, was overruled in Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978),[14] which held that a municipality or other local government unit is subject to suit as a person under § 1983, but that a municipality would not be liable for every unconstitutional action of any of its officers under a theory of Respondeat superior. Id. at 694, 98 S.Ct. 2018. Monell Also held that the same principles which govern suits against municipalities under § 1983 must also govern suits brought against municipal officers in their official capacities. Id. at 690 n.55, 98 S.Ct. 2018. Monell expressly did not decide, however, whether school boards and their members sued in their official capacities are entitled to the same qualified immunity as are the members sued in their individual capacities.[15] Id. at 701, 98 S.Ct. 2018. That question was "left to the lower federal courts," Id. at 714, 98 S.Ct. at 2047 (Powell, J., concurring). We think that the same rationales of fairness and deterrence that the Supreme Court has applied in Scheuer, Wood, and their progeny supply the answer.
 
 
 122
 The deterrence rationale is concerned with the chilling effect on the administration of government that would result from the imposition of liability for constitutional violations perpetrated by public officials. In the context of imposing personal liability for damages on school board members, the Supreme Court in Wood noted that such members have broad decisionmaking power that requires the sound exercise of discretion, and that the imposition of personal liability for deprivations of constitutional rights would inhibit the exercise of such discretion to an unwarranted degree and might actually discourage prospective school board members from seeking office:
 
 
 123
 The imposition of monetary costs for mistakes which were not unreasonable in the light of all the circumstances would undoubtedly deter even the most conscientious school decisionmaker from exercising his judgment independently, forcefully, and in a manner best serving the long-term interest of the school and the students. The most capable candidates for school board positions might be deterred from seeking office if heavy burdens Upon their private resources from monetary liability were a likely prospect during their tenure.
 
 
 124
 Wood v. Strickland, 420 U.S. at 319-20, 95 S.Ct. at 999-1000 (emphasis added).
 
 
 125
 The Supreme Court recognized, however, that this chilling effect must be balanced against the salutary effect of imposing personal liability for constitutional violations. If liability is imposed for at least some constitutional deprivations, there is an obvious economic incentive for the school board member or other public official to conform his actions within constitutional requirements. In striking this balance, the Court concluded that school board members should not be immune from liability for all unconstitutional acts, no matter how unreasonable: "(A)bsolute immunity would not be justified since it would not sufficiently increase the ability of school officials to exercise their discretion in a forthright manner to warrant the absence of a remedy for students subjected to intentional or otherwise inexcusable deprivations." Id. at 320, 95 S.Ct. at 1001. The Court thus concluded, by balancing the favorable and adverse deterrent effects of compensating victims of constitutional violations from the personal resources of school officials, that immunity was justified only for actions taken in good faith.
 
 
 126
 When we turn to the question of compensating constitutional deprivations from public funds in the hands of local government, however, we think that this balance shifts significantly and that no immunity is warranted.[16] While we recognize that a conscientious public official will act so as to avoid an unnecessary drain on public funds, it is a fact of human nature that the official will be less concerned with the expenditure of public funds than with the expenditure of his own personal resources. Moreover, it can hardly be argued that the imposition of governmental liability will deter prospective public officials in any degree from seeking office in the first place. Thus, the chilling effect, recognized in Wood, of imposing personal liability under § 1983 is much more attenuated when the liability is to be satisfied from governmental funds.[17]
 
 
 127
 The Supreme Court itself has recognized the important differences in deterrent effect between personal and governmental liability in Hutto v. Finney, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), decided after Monell. In a suit brought against Arkansas state prison officials in their official capacities to remedy unconstitutional prison conditions, the district court ordered broad injunctive relief, and the court of appeals, in affirming, ordered the state to pay plaintiffs' attorney's fees for the appeal under 42 U.S.C. § 1988. The Supreme Court affirmed this award of attorney's fees, holding that assessing the award against the state would not contravene the eleventh amendment. 437 U.S. at 693-700, 98 S.Ct. 2565. In response to a suggestion that the fees should be borne by the individual prison officials named as defendants, rather than by the state, the Court stated in a footnote that since the state, rather than the individual defendants, had made the decision to appeal the district court's order, it was appropriate that the state should bear the costs of that appeal. The Court went on to note that imposing the attorney's fee award on the individual officials would "def(y) this Court's insistence in a related context that imposing personal liability in the absence of bad faith may cause state officers to 'exercise their discretion with undue timidity.' " Id. at 699 n.32, 98 S.Ct. at 2578 n.32 (citing Wood v. Strickland, 420 U.S. at 321, 95 S.Ct. 992). Thus, the Supreme Court, while recognizing that imposing personal liability on public officials for attorney's fees would have an undue chilling effect on the exercise of their authority, nevertheless ordered that the attorney's fees should be paid from the state's public funds. This recognition by the Supreme Court of the disparate deterrent effects of personal liability and governmental liability supports our conclusion that in a suit for recovery of damages from the government's funds, no immunity defense is warranted.[18]
 
 
 128
 The other rationale for the immunity defense, as set forth by the Supreme Court in Scheuer, is that of fairness. The Court stated that a qualified immunity for an official sued in his individual capacity would be warranted because of "the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations to his position, to exercise discretion." 416 U.S. at 240, 94 S.Ct. at 1688. The "mutually dependent" rationale of fairness has been little discussed by the Supreme Court in its subsequent decisions on qualified immunity in individual capacity suits, which have been grounded largely on the deterrence rationale. See Wood v. Strickland, 420 U.S. at 318-21, 95 S.Ct. 992; Procunier v. Navarette, 434 U.S. 555, 561-62, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); Cf. Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (immunity of federal official sued in individual capacity). When the question of the applicability of a qualified immunity defense in official capacity suits is addressed, however, we believe that the fairness rationale plays a more significant indeed, a decisive role.
 
 
 129
 In individual capacity suits, it is hardly surprising that the fairness rationale has not been more fully developed. When the victim of a constitutional violation seeks to hold personally liable a public official who has acted in good faith, the case involves distributing the loss between two innocent parties. In such a case, fairness considerations are not decisive, and other considerations, such as the importance of protecting the exercise of discretion by public officials as recognized in Wood, assume primary importance. When the victim seeks compensation from public funds in an official capacity suit, however, considerations of fairness are quite different. Imposition of liability in such a case would not shift the loss suffered by the victim to another innocent individual but rather would spread the loss among the public. Liability may not be imposed upon the government, of course, unless, as held in Monell, the constitutional violation occurred by application of a policy or custom established by that government. When an innocent person suffers a loss by virtue of the execution of an unconstitutional policy or custom affirmatively established by representatives of the public, the choice between leaving the entire burden of the loss on the victim or distributing it among the public as a whole is self-evident.[19] We believe that fairness in such a case permits indeed, requires that the loss be shared, and that this fairness rationale applies whether or not the unconstitutionality of the policy or custom was settled at the time it was established.[20]
 
 
 130
 In sum, the rationales of fairness and deterrence, asserted by the Supreme Court as the fundamental justifications for the qualified immunity defense, do not support the extension of that defense to suits against local governments or against government officials in their official capacities.[21] This conclusion is warranted, we believe, whether the relief sought from the government is characterized as legal or equitable. Holding in the instant case that no immunity defense is available to the defendant school board members in their official capacities, we would therefore affirm the judgment of the district court insofar as it ordered the named defendants, in their official capacities, to give the named plaintiffs full relief in the form of both reinstatement[22] and backpay.
 
 II.
 
 131
 While agreeing with us that there are significant distinctions between governmental liability and personal liability which caution against extension of the holding in Wood v. Strickland to local governments sued under § 1983, the concurring opinion would not deny local governments a qualified immunity defense. Rather, it would hold them immune from liability if they acted with "reasonable care under the circumstances, objectively assessed." This test, it is claimed, is different from the test in Wood because, under Wood, an individual officer would be immune if he acted in "subjective good faith," while, under the concurring opinion, the local government would enjoy immunity only if its conduct was reasonable on an objective basis.
 
 
 132
 We think this an incorrect reading of Wood with respect to the scope of the qualified immunity accorded to officials sued in their individual capacities. Wood makes it quite clear that subjective good faith alone is not sufficient to immunize an individual school board member from a damage award:
 
 
 133
 The official himself must be acting sincerely and with a belief that he is doing right, but an act violating a student's constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law on the part of one entrusted with supervision of students' daily lives than by the presence of actual malice. . . . Any lesser standard would deny much of the promise of § 1983. . . . (W)e hold that a school board member is not immune from liability for damages under § 1983 if he knew Or reasonably should have known that the action he took within this sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with malicious intention to cause a deprivation of constitutional rights or other injury to the student.
 
 
 134
 420 U.S. at 321-22, 95 S.Ct. at 1001 (emphasis added).[23]
 
 
 135
 Thus, the subjective and objective elements of the qualified immunity recognized in Wood are not expressed in the disjunctive and mere subjective good faith is not sufficient to immunize an individual officer. It follows, we think, that the proposed intermediate qualified immunity for local governments is not significantly different from that already enjoyed by individual officials. Recognition that the rationales of qualified immunity for individuals do not apply to suits against local governments requires, in our view, that the qualified immunity defense asserted here be unavailable to local governments in any form.[24]
 
 III.
 
 136
 Finally, while we agree with the majority's conclusion in Part VII of its opinion that plaintiffs are entitled to attorney's fees for this appeal under 42 U.S.C. § 1988, we believe that the majority's award of $500 is grossly inadequate. It is true that plaintiffs have not been granted all of the relief that they sought. They have not been successful in obtaining relief on behalf of a plaintiff Class against a Class of defendant school boards. Furthermore, the majority has held them not entitled to an award of backpay. Nevertheless, the plaintiffs have succeeded on this appeal in gaining reinstatement. The extent to which plaintiffs obtained all of the relief they sought is only one of many factors to be considered in setting an attorney's fee. See Wheeler v. Durham City Board of Education, 585 F.2d 618, 624 (4 Cir. 1978); Burt v. Abel, 585 F.2d 613, 617-18 (4 Cir. 1978); Barber v. Kimbrell's, Inc., 577 F.2d 216, 226 (4 Cir.), Cert. denied, 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978).[25]
 
 
 137
 The majority's award of $500, we believe, accords inadequate recognition to the inescapable minimum amount of time and effort that plaintiffs' attorneys must have expended in these cases. The appeal dates back to 1975, when briefs were filed and oral argument was held before a panel of this court. In 1976, before a decision was issued, the court ordered on its own motion that the cases be set for rehearing in banc and asked the parties to address themselves in particular to the issue whether backpay could be recovered from a municipality under § 1983. This order obviously required additional preparation on the part of plaintiffs' attorneys. Before reargument was had, however, we ordered that proceedings be stayed pending the Supreme Court's decision in Monell. Once Monell was decided, additional motions and supplemental briefs were filed by plaintiffs. Without detailing every step, this recitation of required services of which we are aware reveals the inadequacy of the majority's award.
 
 
 138
 Although plaintiff's attorneys have requested a fee award, they have filed no affidavits with this court detailing the amount of time and type of effort expended in representing plaintiffs in this appeal. Rather than summarily ordering the minimal amount of $500, we would either require the filing of such documentation in order to give us a factual basis on which to determine a proper fee, or remand the question to the district court to take proof and to award an appropriate fee.
 
 
 139
 RUSSELL, Circuit Judge, concurring and dissenting:
 
 
 140
 As to Mrs. Gough, I concur in all of Judge Widener's opinion except part VI thereof, and as to that part of his opinion I agree with the principles stated therein, but on the facts of her case I would not require that reinstatement be offered Mrs. Gough because she did not ask for it after her baby was born.
 
 
 141
 As to Mrs. Paxman, I think she suffered no constitutional wrong for the reasons stated by Judge Haynsworth in part IV of his opinion. Therefore, I think none of the various opinions filed has any application to her except part IV of Judge Haynsworth's opinion as mentioned.
 
 
 142
 PHILLIPS, Circuit Judge, concurring and dissenting:
 
 
 143
 For reasons given in Chief Judge Haynsworth's dissenting and concurring opinion, I agree that neither of the named plaintiffs has established a constitutional right to be reinstated, and that the named plaintiff Paxman has not established any violation of constitutional right. To that extent, I dissent from the opinion of the court.
 
 
 144
 For reasons specifically given in this opinion I concur in the holding of the court that the defendant school boards and their members in official capacities are not liable to any monetary claims by reason of a qualified immunity.
 
 
 145
 Otherwise I join the opinion of the court.[1]
 
 
 146
 Considering that neither named plaintiff is entitled to reinstatement and that the plaintiff Paxman has not shown any violation of constitutional right in this action now denied class action status, there remains for me only the question whether the named plaintiff Gough has established any right to monetary relief against her school board and its members in their official capacities. On this point, I of course agree with the court that termination of her employment during the school year violated her constitutional rights under LaFleur. For this she is entitled to compensatory damages unless the school board defendant and its members in their official capacities enjoy a qualified immunity to this claim. On this point I disagree both with the view held by a minority of the court that no immunity exists and with the view that there is a qualified immunity whose scope is defined by the same "good faith" standard announced in Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) for state officials sued in individual capacities. I agree that the governmental entity here should not be liable to the claim for monetary relief by reason of a qualified immunity, but think that the scope of that immunity is properly defined in different, more restricted, terms for municipalities than for officials sued as individuals. It is to that point I write.
 
 
 147
 * When the Supreme Court in Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), held, partially overruling Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), that municipal governments do not enjoy absolute immunity to claims for monetary relief brought under 42 U.S.C. § 1983, it expressly reserved the questions whether they should nevertheless enjoy a qualified immunity and, if so, what the scope of that immunity should be. Monell, 436 U.S. at 695, 701, 98 S.Ct. 2018; Id. at 713-14, 98 S.Ct. 2018 (Powell, J., concurring). Those questions are squarely presented to us on this appeal, and I think we must address them as quite different questions than those respecting the scope of qualified immunity to be accorded officials sued in their individual capacities.[2]
 
 
 148
 An appropriate starting point is to assess the range of possibilities respecting municipalities' exposure to monetary liability for § 1983 violations after Monell. That decision made it plain that exposure is to extend only to those acts directly chargeable to the governing entity,[3] and not to acts or defaults of its agents and employees chargeable to the entity only by Respondeat superior. Equally clearly, there is to be Some degree of exposure for such direct acts, "lest (the decision in Monell ) 'be drained of meaning.' " Monell v. Department of Social Services, 436 U.S. at 701, 98 S.Ct. at 2041 (quoting Scheuer v. Rhodes, 416 U.S. 232, 248, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). Within this limited realm of direct municipal action the possibilities therefore range from strict liability (no-fault) back through liability based upon any of various gradations of fault that have developed in common and, more recently, constitutional, tort law, stopping somewhere short of no-liability irrespective of fault, I. e., absolute immunity.[4] It is the choice among these possibilities that was expressly reserved and left to the lower federal courts in Monell.
 
 
 149
 A court turning to this task is back in the difficult realm of divining what the forty-second Congress intended as remedial sanctions for § 1983 violations. Though Monell has now set right the perceived error in Monroe that denied municipal government's exposure to Any remedy, legislative guidance as to the extent of its now revealed exposure is of course as lacking as it was with respect to that of individual officials. See Wood v. Strickland, 420 U.S. at 321, 95 S.Ct. 992. Guidance must therefore be sought where it was sought for the intended scope of individual liability: in pragmatic considerations of the effects of potential monetary liability on fiscal and decision-making functions of local government and in common law tort and municipal law parallels. Id. at 316-21, 95 S.Ct. 992.
 
 
 150
 Those considerations as applied to individual municipal officials' personal liability led the Supreme Court in Wood v. Strickland to find such officials immune for all their official actions except those that "(could not) reasonably be characterized as being in good faith." Id. at 322, 95 S.Ct. at 1001. In Wood, two types of conduct denying constitutional rights were posited in defining the reach of this qualified immunity: actions taken with actual or constructive knowledge that they were constitutionally impermissible, and actions taken with malicious intent to deny the rights or to cause other injury. Id. Analyzed in traditional fault terms, the inclusion of a subjective "good faith" element as a limiting factor in defining the scope of individual immunity in effect immunizes against "mere" or "simple" negligence and exposes to liability only for actions taken with actual malice, with specific intent, or in negligence of the type traditionally characterized as "gross", "wanton," or "reckless."[5]
 
 
 151
 The relatively generous qualified immunity that results for individual officials has been thought necessitated by several factors that weigh heavily in the balance against the constitutional rights denied by the immunized actions. Chief among these is the negative impact that any greater exposure would have upon the ability to attract responsible people to municipal office in the first place, See, e. g., Wood v. Strickland, 420 U.S. at 320, 95 S.Ct. 992, and upon their effectiveness as official decision-makers and actors once in office, See id. at 319-20, 95 S.Ct. 992. See also Gregoire v. Biddle, 177 F.2d 579 (2d Cir. 1949) (L. Hand, J.). Additionally, parallels in state common law tort doctrines of official immunity have been thought so well settled that Congress could not have intended fully to abrogate them when it enacted § 1983. See Wood v. Strickland, 420 U.S. at 316-18, 95 S.Ct. 992. Finally, the potential unfairness in exposing an individual official to personal financial ruin for lacking the prescience and legal resources required accurately to "predict( ) the future course of constitutional law," Pierson v. Ray, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967), has been thought to require a fairly wide scope of individual immunity in respect of actions only later judicially determined to have been unconstitutional.
 
 
 152
 When the same considerations are applied to direct action taken by municipal government itself through its governing boards, a wider exposure (more qualified immunity) based upon more demanding fault standards than those applied to individual officials seems plainly indicated. This may be tested by looking at each consideration separately.
 
 
 153
 The consideration of attracting responsible individuals to municipal offices in the first place cannot be thought a substantial factor here. Exposure of the public treasury to monetary claims for constitutional deprivations is not likely to have any substantial chilling effect on responsible candidacies for public office.
 
 
 154
 The potential chilling effect on official action of the governing entity presents a closer question. The majority opinion assumes, and finds support in the decisions of other federal courts, that exposure of the public treasury to § 1983 claims will have substantially the same inhibiting effect on forceful governmental action by governing bodies as would exposure of their private purses have upon the decisions and actions of individual officials comprising the bodies. See Bertot v. School District No. 1, 613 F.2d 245 (10th Cir. 1978); Owen v. City of Independence, 589 F.2d 335 (8th Cir. 1978); Ohland v. City of Montpelier, 467 F.Supp. 324 (D.Vt.1979); Gross v. Pomerleau, 465 F.Supp. 1167 (D.Md.1979). But see Kostka v. Hogg, 560 F.2d 37, 41 (1st Cir. 1977). This suggests for the majority as for those other courts the appropriateness of defining the qualified immunity of municipal governments in precisely the same terms as those applied to individual officials. With all respect for these contrary judicial views as well as for the sense of public responsibility had by most officials, I simply doubt the validity of that assumption. We all must necessarily draw on our perceptions of human nature here, having no empirical evidence to guide us. My own assessment is that exposure of the public treasury would impose substantially less constraint upon vigorous and forceful governmental action by a governing body than would exposure of the private purses of its members for the same action. From this I conclude that a more stringent standard of care is suggested for corporate governmental action to ensure the same level of concern for constitutional rights that is thought to be ensured by the good faith standard determinative of personal liability of individual officials.[6]
 
 
 155
 Turning next to considerations of state common law parallels in respect of municipal immunity, the picture confronting the forty-second Congress was essentially one of absolute immunity in respect of governmental functions.[7] It seems highly unlikely that in breaching this citadel of absolute immunity the Congress could have intended to open the gates to the maximum exposure of strict liability. But no reason appears why it may not have contemplated a different and more stringent standard for municipal immunity than the good faith standard then typically applied to individual officials.
 
 
 156
 Turn finally to considerations of the elemental fairness and practicality of holding municipal government to knowledge of the current state of constitutional law or more critically, to "predicting its future course" when it is in an evolving, unsettled state. It seems clear that concerns of elemental fairness and practicality have been dominant in adoption of the good faith standard for individual officials. It has simply been thought unfair and impractical to impose any higher standard than one looking ultimately to the heart rather than the head or will of an individual official even where constitutional rights are at stake.
 
 
 157
 This is a concession that need not be made in respect of local government itself out of comparable concerns for fairness and practicality. There are resources available to local government officials acting corporately as a governing body that are not available to the governmental officials acting alone. Chief among these is the resource of corporate action itself. Among other reasons for constituting multiple member bodies as ultimate governing authorities in municipal government is the public expectation that three or five or seven heads are likely to be wiser acting in official conclave under rules of order than one acting alone and frequently Ad hoc. And not only wiser, but more circumspect and more knowledgeable, particularly in respect of matters, including the legality of contemplated action, requiring reliance upon professional advice provided by public funds. It seems reasonable to assume that a Congress undoubtedly conscious of this higher level of public expectation built into the very structure of municipal government would have contemplated a correspondingly higher standard of care in respect of direct local government actions.
 
 
 158
 It seems also reasonable however to assume that Congress could not, for equally valid public policy reasons, have intended to impose upon municipalities a strict liability standard in which no limiting inquiry of exculpating factors related to fault would be appropriate. Those public policy reasons have recently been well-stated in Ohland v. City of Montpelier, 467 F.Supp. 324, 343, Quoted in the majority opinion at p. 860. Ohland's analysis is compelling in its assessment of the inappropriateness of imposing strict liability on local governments as a matter of contemporary public policy.[8] Attempting to find the intention of the Congress in 1871 on the matter, it seems reasonable to assume a like perception of the inappropriateness of imposing a no-fault, strict liability standard at that time.
 
 
 159
 With caution, it may also be observed that the Monell Court, on a record in which constitutional deprivation was clear, declined to take the opportunity thereby presented to announce a rule of strict liability that would have been dispositive of the liability issue in that case.[9]
 
 II
 
 160
 As this discussion has indicated, I believe that municipalities should be held to have a qualified immunity in respect of § 1983 claims for monetary relief, I. e., that they should not be held to strict liability, but that their immunity should be defined by a stricter standard than the good faith standard applied to individual officials by Wood and its predecessor cases. The appropriate standard, and one which it seems fair to assume was the limit that could have been intended by the Congress in 1871, would be the traditional fault standard defining ordinary negligence in tort law: reasonable care under the circumstances, objectively assessed.
 
 
 161
 No need exists in this case to anticipate the way in which this standard might be applied to every type of direct action exposing municipalities to potential monetary liability under § 1983. Suffice it to say for the type action involved here that while it would not demand prescience in predicting the future course of constitutional law, it would demand a careful use of all the resources available to the governing board acting corporately to be advised on the matter as fully as might reasonably be expected of the board as constituted and situated. This would certainly look to the provisions made by the board for obtaining competent legal counsel in the realm of constitutional law, to the way in which that counsel was made available to the board in respect of particular problems, and to the care with which it was utilized by the board in the particular situation in question. Under this standard, "good faith" in the sense of an absence of malice or specific intent or recklessness would not immunize a municipality whose governing board had failed to take steps reasonably available to it to avoid acting unconstitutionally, with reasonableness gauged solely on an objective basis.
 
 
 162
 As indicated at the outset, I believe that under this standard as well as the good faith standard the named school boards in this appeal are not liable for the monetary relief sought. The reasons which the majority found probative of good faith on the facts of this case are also probative here of care reasonable under the circumstances. Because the two standards will not always, however, necessarily yield the same result when applied to the same facts,[10] it seems important to me that the different standards now be recognized. I would do so in this decision of the in banc court.
 
 
 
 [1]
 § 1983. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress
 Jurisdiction is claimed under 28 U.S.C. §§ 1343 and 2201. § 2201, a part of the Declaratory Judgment Act, of course, is not a section upon which jurisdiction may be based. There must be an independent basis for jurisdiction before declaratory relief may be sought under § 2201. Wright & Miller, Federal Practice and Procedure, § 2766 (1973), and cases there cited. Jurisdiction, here, is thus based on § 1343, and the cause of action on § 1983. Our holding applies to cases under these statutes only. The Supreme Court made this same point clear in its decision in City of Kenosha v. Bruno, 412 U.S. 507, esp. pp. 513-514, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973).
 
 
 [2]
 The record indicates that in late 1972 both the Albemarle and Henrico County School Boards rescinded their maternity leave policies. Therefore, any issues relating to declaratory or injunctive relief against the future enforcement of those policies have become moot
 
 
 [3]
 The Albemarle County maternity leave policy provided: A teacher who becomes pregnant prior to reporting for duty at the beginning of a new school term shall report this fact to the Superintendent and obtain a release from her contract
 A teacher who becomes pregnant after commencing her contractual duties shall relinquish her position four months before the expected date of delivery except when the four months period occurs with only one report card period remaining to complete the contractual obligations for the term. The teacher will be required to submit to her principal a physician's statement giving the approximate date of delivery when the pregnancy becomes known. Teachers in good standing who have completed one year of service are eligible for maternity leave without pay. Such teachers will be allowed to return to the system at a time mutually acceptable to the teacher and the administration.
 At the discretion of the Superintendent and Principal, teachers who become pregnant may continue beyond the established termination date whenever suitable replacements cannot be found.
 
 
 [4]
 The Henrico County policy provided, in pertinent part:
 Pregnancy of four months duration shall be sufficient cause for termination of contract, and earlier if deemed advisable. This regulation may be waived by the superintendent or his designated representative in individual cases whereby the teacher may continue for another thirty (30) days or so if deemed to be in the best interest of the school system.
 
 
 [5]
 The school semester ended on January 23, 1972
 
 
 [6]
 FRCP 23(b)(1):
 An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
 (1) the prosecution of separate actions by or against individual members of the class would create a risk of
 (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
 (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.
 
 
 [7]
 The Court stated it followed Singleton v. Vance County Board of Education, 501 F.2d 429 (4th Cir. 1974), in which this court held that a school board is not a person within the meaning of § 1983
 
 
 [8]
 Under Rule 23(a), it is requisite to the maintenance of all class actions that:
 (1) the class is so numerous that joinder of all members is impracticable,
 (2) there are questions of law or fact common to the class,
 (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and
 (4) the representative parties will fairly and adequately protect the interests of the class.
 
 
 [9]
 Our holding in no way prevents the utilization of Rule 23(b)(2) in cases in which a class of plaintiffs brings suit against more than one Named defendant, each one of which has taken like action affecting directly the individual members of the plaintiff class. See East Texas Motor Freight v. Rodriquez, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977); Hill v. Western Electric Co., Inc., 596 F.2d 99 (4th Cir. 1979). Indeed, an intention of the Rule was to facilitate class action treatment in the civil rights area, such as where, for example, an employer and a union are joined as defendants in a complaint alleging racial discrimination in employment. See Wright, supra, § 1775
 In this case, in contrast, more than 130 different school boards were free to adopt maternity leave policies of entirely unknown differences or similarities. It is uncontradicted that there was no state-wide policy in force, centrally directed or otherwise.
 
 
 [10]
 Prior to the district court's March 5, 1975 holding, in which the court held that the plaintiff class was entitled to summary judgment, Members of such school boards that maintained allegedly discriminatory maternity leave policies were not part of the defendant class as it had been previously defined
 
 
 [11]
 FRCP 24(b) provides for intervention in the discretion of the district judge upon timely application when, Inter alia, an applicant's claim or defense and the main action have a question of law or fact in common. Rule 24(a) concerns intervention as a matter of right. See American Pipe, p. 552, n. 22, 94 S.Ct. 756
 While our remand pertaining to intervention applies only to school teachers in Henrico and Albemarle Counties, there is broad language in American Pipe indicating that the statute of limitations would be tolled for all members of the class originally certified by the district court. "We are convinced that the rule most consistent with federal class action procedure must be that the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." 414 U.S. at 554, 94 S.Ct. at 766.
 
 
 [12]
 In Burt and in Cale v. City of Covington, 586 F.2d 311 (4th Cir. 1978), we considered the application of Monell, but in neither case was the question of immunity considered or decided
 
 
 [13]
 For a discussion of those reasons, see Wood v. Strickland, 420 U.S. 308 at 313-322, 95 S.Ct. 992. The court relied on Wood and Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), and Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)
 
 
 [14]
 By quoting from Ohland, we do not imply our decision is based on retroactivity; rather, it is based on good faith immunity
 14a Sala v. County of Suffolk, 604 F.2d 207 (2d Cir. 1979), decided while our case was pending, is consistent with this opinion.
 
 
 [15]
 The declaratory and injunctive aspects of the case were moot, as the Court acknowledged in its opinion. Monell, p. 661, 98 S.Ct. 2018
 
 
 [16]
 Whether Mrs. Paxman was eligible for medical leave without pay and its accompanying provision for return to work appears not to have been considered
 
 
 [1]
 There was no discussion of this matter in the district court's opinion. In its final, formal order, reinstatement was directed with the payment of lost wages as if employment was, or should have been, continuous. Of course, there is no basis for an assumption that a childbearing mother would have a continuing availability
 
 
 [2]
 Schnapper, Civil Rights Litigation After Monell, 79 Col.L.Rev., 213, 240 et seq
 
 
 *
 Since Parts I-IV and VI of the opinion of Judge Widener are concurred in by all of the judges hearing the case and Part VII by a majority of the judges hearing the case, we refer to it as the "majority" opinion and those joining in it as the "majority," even though, with respect to Part V, they are only two in number. The special concurrence of Judge Phillips, in which Chief Judge Haynsworth joins, will be referred to as the "concurring" opinion
 
 
 [1]
 See Cleveland Board of Education v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974)
 
 
 [2]
 The term "good faith" is used in this context to refer not simply to the absence of malice, but rather to the subjective and objective tests for good faith as employed by the Supreme Court in its qualified immunity decisions. See, e. g., Procunier v. Navarette, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)
 
 
 [3]
 Plaintiff Eslinger had applied for a position as page a full year before the Supreme Court announced its decision in Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971)
 
 
 [4]
 Eslinger v. Thomas, 340 F.S. 886, 890, 895 (D.S.C.1972)
 
 
 [5]
 The only acknowledgment in our opinion that the clerk was being sued in his official capacity appears in a footnote stating that the question of the applicability of the eleventh amendment to suit against a state officer in his official capacity need not be decided. 476 F.2d at 229 n.3
 
 
 [6]
 Eslinger was decided before the Supreme Court clarified the elements and applicability of the qualified immunity defense in Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), and Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). The nature of the defense was a much disputed issue before these Supreme Court decisions, and a number of lower courts had reached widely varying conclusions on the issue. See, e. g., Cases cited in Wood v. Strickland, 420 U.S. at 315 n.7, 95 S.Ct. 992
 
 
 [7]
 Our view in the Eslinger footnote that the legal or equitable nature of a claim for relief is relevant to the availability of a qualified immunity defense finds support in the subsequent case of Wood v. Strickland, 420 U.S. 308, 314 n.6, 95 S.Ct. 992, 997 n.6, 43 L.Ed.2d 214 (1975), where the Supreme Court stated: "(I)mmunity from damages does not ordinarily bar equitable relief as well." The majority, however, now seeks to avoid the force of the Eslinger footnote by arguing that the Supreme Court, in Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), "has ended any distinction, sometimes made, between backpay and money damages." Maj. op. at 857. If the majority's expansive reading of Monell in this respect is correct, then Eslinger can no longer be regarded as good authority and the majority's reliance on it is misplaced. As our discussion of Eslinger and of subsequent cases in this circuit shows, the Eslinger opinion relied heavily on the distinction between legal damages and equitable backpay. If, as the majority states, this distinction, so crucial to Eslinger, is no longer valid and must be rejected, then the reasoning and holding of Eslinger must be rejected as well
 In any event, we believe that the majority, in concluding that the Supreme Court has ended the distinction between legal damages and equitable backpay, seriously misreads Monell. The full sentence in Monell on which the majority relies reads as follows: "Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. at 690, 98 S.Ct. at 2035-2036. Even if the majority's reading of the words "monetary . . . relief" to refer specifically to the backpay requested by the Monell plaintiffs is accepted, there is nothing in those words to indicate that the Court regarded backpay as identical to legal damages. The Court used the term "monetary" relief, not "legal" relief, and it contrasted this term with "injunctive" relief, not "equitable" relief. We cannot accept the proposition that the Supreme Court's passing reference to "monetary, declaratory, or injunctive relief" was a cryptic rejection of the long-established distinction between legal damages and equitable backpay incident to reinstatement. See, e. g., Albemarle Paper Co. v. Moody, 422 U.S. 405, 441-47, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (Rehnquist, J., concurring); NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 48, 57 S.Ct. 615, 81 L.Ed. 893 (1937). Indeed, since Monell, the Supreme Court has stated that § 706(g) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(g), which permits a backpay award for employment discrimination, "authorizes only equitable remedies." Great American Federal Savings & Loan Association v. Novotny, 442 U.S. 366, 375, 99 S.Ct. 2345, 2350, 60 L.Ed.2d 957 (1979).
 
 
 [8]
 Although the plaintiff teacher had originally sought backpay in connection with reinstatement, she abandoned the demand for reinstatement when she reached the normal retirement age. 521 F.2d at 1203
 
 
 [9]
 Burt reaffirmed the principle then prevailing in this circuit that a local official could be sued, even in his official capacity, as a "person" under § 1983. 521 F.2d at 1205 (citing Harper v. Kloster, 486 F.2d 1134, 1138 (4 Cir. 1973))
 
 
 [10]
 Each member of the panel filed a separate opinion. An introductory per curiam statement, however, made clear that Judge Craven's opinion represented the views of a majority of the panel on every issue except the calculation of damages. 521 F.2d at 1203
 
 
 [11]
 On remand, the district court made clear that the defendants were sued in their official capacities, and it awarded extensive equitable relief. On appeal from this decision, we found it necessary to remand for further consideration in light of intervening changes in law, not relevant to the present issue of immunity. Burt v. Abel, 585 F.2d 613 (4 Cir. 1978)
 
 
 [12]
 See n.9 Supra
 
 
 [13]
 The Supreme Court reversed our holding that Bursey's rights had been violated, but it expressed no views on the immunity issue
 
 
 [14]
 The facts in Monell were strikingly similar to those in the instant case. The plaintiffs were female employees of the Department of Social Services and the Board of Education of New York City. Their complaint alleged that the Department and the Board had, as a matter of official policy, required pregnant employees to take leaves of absence before such leaves were medically necessary. Their suit, seeking injunctive relief and backpay, was brought against the Department and its commissioner, the Board and its chancellor, and the City of New York and its mayor. Each of the individual defendants was sued in his official capacity only. 436 U.S. at 660-61, 98 S.Ct. 2018
 
 
 [15]
 Monell did hold that municipal bodies sued under § 1983 do not enjoy an Absolute immunity. 436 U.S. at 701, 98 S.Ct. 2018
 
 
 [16]
 See generally The Supreme Court 1977 Term, 92 Harv.L.Rev. 57, 322-23 (1978); Note, Damage Remedies Against Municipalities for Constitutional Violations, 89 Harv.L.Rev. 922, 956-58 (1976)
 
 
 [17]
 On the other side of the balance, the positive deterrent effect of imposing liability, in encouraging governmental officials to conform their actions to the requirements of the Constitution, is of greater importance in an official capacity suit than in an individual capacity suit. When an official is sued in his individual capacity, the constitutional injury usually arises from an ad hoc decision of that official and its adverse effect is usually limited to the individual plaintiff or plaintiffs. By contrast, Monell requires that in a suit against a local government or against a government official in his official capacity, no liability may be imposed unless the injury is caused by execution of a policy or custom established by the government. Thus, the act complained of is not the decision of a single government administrator, but rather the application of a broad-based policy, more likely to affect a larger class of persons. Where the establishment of such general policies is concerned, the public interest in ensuring that constitutional requirements are observed is accordingly greater
 
 
 [18]
 Citing this passage from Hutto, an Amicus brief argues that the Supreme Court has already decided that local governments enjoy no qualified immunity and that this decision is binding upon us. We cannot agree with this extreme position. We do not believe that the Supreme Court would use a brief remark in a footnote as a cryptic way of deciding, as a matter of binding precedent, a controversial constitutional issue upon which it has previously reserved decision. We do believe, however, that the Hutto footnote indicates Supreme Court agreement with our view that the deterrence rationale, which led the Court to grant a qualified immunity for officials sued in their individual capacity, has much less force, if any, when applied in the context of official capacity suits
 
 
 [19]
 In the context of common law tort suits against a municipality, commentators have relied upon this loss-spreading analysis in urging the abrogation of municipal immunities. See, e. g., K. Davis, Administrative Law Treatise § 25.17 (Supp.1970); W. Prosser, Handbook of the Law of Torts § 131, at 978 (4th ed. 1971). One commentator, who has employed the loss-spreading analysis in endorsing the denial of qualified immunity to local governments for constitutional violations, suggests that the analysis may be inapplicable in "cases involving generalized injuries to broad segments of the population," such as actions for damages by an entire black community for injuries caused by a segregated school system. See Note, Supra note 16, at 958. The instant case, of course, does not present this difficult problem, and we express no opinion on the matter. We note, however, that a denial of damages in such a case might be based not on the good faith of the government, but rather on the inappropriateness of a damage remedy under § 1983 for such generalized constitutional injuries
 
 
 [20]
 Quoting from Ohland v. City of Montpelier, 467 F.Supp. 324, 345 (D.Vt.1979), the majority argues that it is inappropriate to view the public as "insurers" for injuries inflicted in good faith by the government on individuals. We would agree with this argument insofar as it applies to the constitutional violations committed unknowingly by a single administrator carrying out his duties. The government as a whole cannot fairly be deemed responsible for such violations. But as the Supreme Court held in Monell, the local government itself can be held liable for a constitutional deprivation only if it resulted from the execution of a policy or custom established by the government. Thus, governmental liability is imposed not when the violation is committed by a single administrator, who may err despite the most careful public scrutiny and supervision, but only when the injury is the consequence of an established policy, set by those officials most responsible to the public and most sensitive to public opinion. To compensate victims of such an unconstitutional policy from governmental funds does not impose upon the public the unwitting role of the helpless insurer, but rather places the responsibility for such constitutional injuries where it belongs
 
 
 [21]
 As the majority notes, a few other federal courts have, since Monell, concluded that local governments should enjoy the same qualified immunity as their officials enjoy in their individual capacities, but we respectfully disagree with those decisions. We note that one other federal court agrees with us that municipalities sued under the Monell doctrine cannot invoke the qualified immunity defense. Shuman v. City of Philadelphia, 470 F.Supp. 449 (E.D.Pa.1979)
 
 
 [22]
 Since the majority orders in Part VI of its opinion that the named plaintiffs be reinstated, we concur in that result. We are puzzled, however, by the citations in Part VI to Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), and Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), which we believe unnecessarily complicate the issue. Young and Edelman deal principally with the absolute immunity accorded states by the eleventh amendment, which has no application to units of local government, See, e. g., Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 279-81, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Surely there can be no doubt that § 1983 authorizes reinstatement as an equitable remedy for an unconstitutional dismissal. Even under the majority's view that the school board members in their official capacities are immune from a backpay award, reinstatement would nevertheless be authorized. "(I)mmunity from damages does not ordinarily bar equitable relief as well." Wood v. Strickland, 420 U.S. at 314 n.6, 95 S.Ct. at 997 n.6
 
 
 [23]
 It was the Court's articulation of this objective standard that caused Justice Powell, joined by three other Justices, to dissent:
 It would impose personal liability on a school official who acted sincerely and in the utmost good faith, but who was found after the fact to have acted in "ignorance . . . of settled, indisputable law." . . . This harsh standard, requiring knowledge of what is characterized as "settled, indisputable law," leaves little substance to the doctrine of qualified immunity.
 420 U.S. at 327-28, 95 S.Ct. at 1003-1004 (Powell, J., dissenting).
 
 
 [24]
 The concurring opinion asserts that we favor a "no-fault, strict liability standard" for suits against local governments under § 1983. The statement is accurate only insofar as it states that we would hold a local government liable for a constitutional violation, regardless of whether it knew of the existence of the constitutional right in question. The actor's state of mind, however, may be relevant to the question whether a constitutional violation was committed at all, and thus whether a cause of action under § 1983 is stated. See Baker v. McCollan, --- U.S. ----, ----, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)
 
 
 [25]
 The determination of a reasonable attorney's fee required consideration of a number of factors, including:
 (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.
 Barber v. Kimbrell's, Inc., 577 F.2d at 226 n.28 (citing Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5 Cir. 1974)).
 
 
 [1]
 Except that I would not find the class action improperly certified under Fed.R.Civ.P. 23(b)(2) for the reason that a defendant class against plaintiff class alignment is never appropriate under 23(b)(2). The proper and sufficient reason in my view is simply that here the defendant class had not "acted or refused to act on grounds generally applicable to the class (of plaintiffs)," as required by that subsection
 
 
 [2]
 I also consider them to be questions not previously addressed authoritatively by this court. With Judge Winter's dissenting opinion and essentially for the reasons it gives, I agree that Eslinger v. Thomas, 476 F.2d 225 (4th Cir. 1973), cannot be read as having already committed us to the view that municipalities enjoy the same good faith immunity as do officials sued individually. But neither do I believe that the cases cited in Judge Winter's dissenting opinion, Burt v. Board of Trustees, 521 F.2d 1201 (4th Cir. 1975), and Thomas v. Ward, 529 F.2d 916 (4th Cir. 1975), can properly be read to have committed us to the contrary view that municipalities enjoy no immunity to claims for monetary relief. These latter cases all dealt with claims for back pay pendent to injunctive relief against local government bodies, and at most stand for the proposition that there is no qualified immunity to such "equitable" monetary claims. They did not speak to compensatory damage claims such as that of the named plaintiff Gough here. While I think that Monell may well have required a general reexamination of any supposed distinctions for immunity purposes between legal and equitable monetary claims, See Monell, 436 U.S. at 712, 98 S.Ct. 2018 (Powell, J., concurring), such a reexamination is not necessary here on my view that the only monetary claim now before the court is a legal damage claim. When and if reexamination becomes appropriate it will be of great significance to me that the only basis upon which any degree of qualified immunity to § 1983 claims has been thought required has been the felt need to protect against fiscal calamity in governmental operations a consideration as to which the arcane distinctions between legal and equitable remedies has not the slightest relevance. We are of course bound by Constitution, statute and rule to labor with the distinctions for jury trial purposes, but not, so far as I can see, for any other certainly not any derivable from the presumed congressional intent behind 42 U.S.C. § 1983
 
 
 [3]
 This appeal does not require us to explore the full sweep of the "direct" municipal actions that are exposed to possible liability by Monell. It suffices to observe that here there is involved the most obvious type: a formal, specific policy of general application, adopted by a local governing body and intended to be executed without significant intermediate discretion
 For this court as for the Monell court, the "substantial line-drawing problems" that inhere in the concept of direct municipal action can await another day's resolution. Monell v. Department of Social Services, 436 U.S. at 713, 98 S.Ct. 2018 (Powell, J., concurring). It is by this process of line-drawing that municipal liability based on breach of an ordinary negligence standard may be kept within acceptable bounds in relation to omissions to legislate or supervise. Cf., e. g., Rizzo v. Goode, 423 U.S. 362, 370-71, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).
 
 
 [4]
 In the analysis of competing interests that gave rise to qualified immunity for individual officials in Wood and its predecessors, fault emerged as the inevitable determinant of scope
 The traditional common law tort gradations of fault therefore provide the obvious reference points for defining the scope of other official immunities.
 
 
 [5]
 Wood 's analysis concededly is not made in these traditional fault terms; but they are implicit. Within that analysis there is a suggestion that simple ignorance of the law, I. e., "mere" negligence in failing to know what one "reasonably should have known" might expose the individual official to personal liability. Id. at 322, 95 S.Ct. 992. Indeed, the dissent in Wood reads the quoted passage as presuming malice from simple ignorance, thereby imposing an intolerably strict burden on individual officials. Id. at 328-29 & n.2, 95 S.Ct. 992 (Powell, J., concurring in part and dissenting in part). But the critical final requirement for liability under the standard as defined by the majority in Wood is a lack of "subjective" good faith. Id. at 321-22, 95 S.Ct. 992. It seems inevitable that in application by triers of fact this bottom-line requirement of a subjective lack of good faith will be the critical factor in adjudication. See Newman, Suing the Lawbreakers: Proposals to Strengthen the Section 1983 Damage Remedy for Law Enforcers' Misconduct, 87 Yale L.J. 447, 461 (1978)
 
 
 [6]
 Reflecting my perception that the balance properly being sought here is the maximum amount of deterrence at all levels that is compatible with personal and governmental ability practically to avoid constitutional mistakes in the first place and to respond without financial ruin to those nevertheless made
 
 
 [7]
 See Monell v. Department of Social Services, 436 U.S. at 720-21, 98 S.Ct. 2018 (Rehnquist, J., dissenting)
 
 
 [8]
 When the commentators have looked to public policy considerations of risk-allocation, chill-effect, and the threat of fiscal calamity as determinants of the appropriate standard for municipal liability they have come out divided. Compare, e. g., Blum, From Monroe to Monell: Defining the Scope of Municipal Liability in Federal Courts, 51 Temp.L.Q. 409, 444-45 (1978), With, e. g., Note, Liability of State and Local Governments Under 42 U.S.C. § 1983, 92 Harv.L.Rev. 311, 323 (1978)
 The most compelling public policy reason for rejecting a strict liability standard is the potential for actual fiscal ruin that it could pose for the honestly, reasonably careful municipal government whose constitutional mistake was subsequently determined to have caused compensable harm to large numbers of individuals. This prospect has led some commentators who generally favor strict liability to suggest a special qualified immunity for this type situation. Note, Supra at 323; See Note, Damage Remedies Against Municipalities for Constitutional Violations, 89 Harv.L.Rev. 922, 958 (1976). Though it may be realized but rarely in actual experience, and with increasing rarity as the deterrent effect of municipal exposure is experienced, the threat remains a real one and must be taken into account.
 
 
 [9]
 See also Monell v. Department of Social Services, 436 U.S. at 713 n.9, 98 S.Ct. 2018 (Powell, J., concurring)
 
 
 [10]
 It might be thought that the good faith test of Wood as transposed to municipalities would ordinarily yield the same results in actual litigation as would an avowedly objective due care test. This would be on the basis that a municipality's "good faith" would be tested against a stricter standard precisely because of its better opportunity to act in an informed manner. It seems much more likely that inquiry specifically directed to a municipality's "good faith" would be nothing more than inquiry into the subjective good faith of the several individuals making up the corporate body (or that of the prevailing majority if the unconstitutional action was by a divided vote?). Factual inquiries into subjective states of mind of individuals are difficult enough. The very idea of making informed factual inquiry into the subjective good or bad faith of a corporate entity is so anomalous that for this reason alone such a standard seems inappropriate. Fact finding would inevitably founder in the attempt to apply it rationally, and some standard other than the one supposedly controlling would actually be applied. Ensuring in practice the wider exposure to liability that seems appropriate for municipalities therefore requires the imposition of a different, more stringent standard of care, and not a hoped-for stricter application of the same standard